## McMasters *versus* Blair.

On the question of testamentary capacity of a dying man, the fact of an occasional flightiness or wandering of intellect during his sickness is generally of very slight importance.

Notwithstanding temporary mental disorder, the presumption is still that a man is competent when he makes his will, and the contrary ought to be proved before the jury can find it.

If a testator understands in detail all he is about, it is quite sufficient to sustain his will. It is not necessary that at the time he should have a recollection of all his estate—his family relations in life—their condition in general, and the probable effect the proposed disposition will have, and to collect this all in one view.

A widow of a testator, not being bound by the will of her husband, has therefore no right to contest the validity of such will.

ERROR to the Court of Common Pleas of *Crawford county*.

This was a feigned issue from the Register's Court to try the validity of the will of Robert Blair, deceased, in which the plaintiff in error was plaintiff below, and Martha Blair, the widow of the testator, defendant. The will was dated March 4, 1854, and was proved in due form the 8th of the same month. The only question in the Common Pleas was as to the competency of testator to make a will.

Mr. Blair was about sixty-five years of age—was an intelligent farmer—read a good deal, and was a man in his situation of considerable information—was fond of anecdotes and relished a joke. The peculiar traits in his character manifested themselves to the latest, as indicated in some of his remarks as narrated by the witnesses—a stranger might regard them as the signs of an unsound mind, but to those who were familiar with him they were perfectly natural. The scrivener commenced writing the will at about noon of the 3d March, and finished about 2 o'clock the next morning. He wrote the will in a room adjoining that in which the testator lay, with the door open, so that the testator could see him. When he had written an item he would go to the testator and read it to him, and pursued this course till the will was written.

The defence called several witnesses to support the allegation of Blair's incompetency to make a will in consequence of imbecility or derangement of intellect.

Against this, plaintiff produced the scrivener, whose testimony was full and explicit, detailing what took place between the testator and himself during the fourteen hours that transpired from the commencement to the execution of the will. He said that Blair's mind was during the night as bright as ever. Other witnesses corroborated the scrivener.

[McMasters *v.* Blair.]

*Defendant's first and thirteenth points.*—1. The intestate laws make so just a distribution of a decedent's estate, that no other can be set up except upon full and satisfactory statute proof that such was the real intention of the decedent; and hence, a sound and disposing mind and memory in the testator, must be found at the time he so expressed his intention, and this mental soundness consists in ability to reflect upon his business affairs; understand the nature of what he is doing; with a recollection of all his estate—his family relations in life, as well as their condition in general, and the probable effect the proposed disposition will have, and to collect this all in one view.

13. Whenever the provisions of an alleged will are inconsistent with natural justice, it requires strong proof of capacity and volition to sustain or establish it to be a valid will, and slight proof of incapacity under influence or fraud, is sufficient to set aside such a will.

The court (GALBRAITH, P.) charged as follows: "The general presumption of law, in relation to a will legally proved, is in favour of the sanity or capacity of the testator, and the burden of proof is on him who attacks its validity on that ground. (Sterns and Wife *v.* Vancleve, 4 *Wash. C. C. Reports* 269, read and commented upon.) If a general state of insanity of the testator is established, then the presumption is changed and the burden of proof thrown upon those who set up the will. The general rule is very briefly and clearly stated in the case of Harrison *v.* Cowan, at page 555, 3 *Wash. C. C. Reports*, as to the capacity of the testator. It is there stated, 'He must, in the language of the law, have a sound and disposing mind and memory. In other words, he ought to be capable of making his will with an understanding of the nature of the business in which he is engaged—a recollection of the property he means to dispose of—of the persons who are the objects of his bounty, and the manner in which it is distributed between them.' It is not necessary that he should have sufficient capacity to transact business as a person in the full possession of his powers and faculties—much less capacity would be sufficient to make a will than to enter into a contract. I know of no case reported in any of the books in which the general rules of determining a testamentary capacity, are more fully, clearly, and truly stated, than in the case of Leech *v.* Leech, by Judge KING of the Common Pleas of Philadelphia, reported in *Am. Law Jour.* vol. 4 (new series), p. 174 (a considerable portion of the principles stated in that case, read to the jury, and applied to portions of the testimony, on both sides of the cause).

"With these general rules, it is for the jury to consider the whole evidence in the cause. The testimony perhaps pretty clearly establishes that the testator was in a state of great bodily weak-

[*McMasters v.* Blair.]

ness, and had been languishing for several days, sometimes suffering much from sickness and pain, and that he died in a few hours after the execution of the will, and that his mind was to a considerable extent enfeebled, was a necessary consequence; but the inquiry is for you to ascertain whether it was so far enfeebled as to establish testamentary incapacity. The subscribing witnesses who are competent in law to testify to their opinions of his capacity, while other witnesses can only testify to their opinion after stating facts upon which their opinions are founded, have given their opinion now as to the testator's capacity at the time of the execution of the will and before and after; other witnesses have stated his situation, his acts, conversation, &c., with some detail. As to the mode of testifying, there is no witness more satisfactory than Hugh Blair, the brother of the testator, who, declining to give any opinion on the question of capacity further than to say he did not hear 'any nonsense' from him, details minutely the whole conversation, expressions, acts, and conduct of the testator before the execution of the will, about the time and down to the close of life. It is for the jury to say how far they rely on his testimony, and what bearing it has on the point of inquiry, keeping in view particularly the state of the testator's mind at the time of the execution. Among the witnesses who have detailed acts and conversations upon which they testify to an opinion against the capacity, is Dr. Clark, who was the attending physician for two or three days before his death, and saw him, and visited and examined him in the evening before his death; describes his symptoms, the nature of his disease and how it operated, both upon his body and mind. The testimony of a physician attending his patient, as a general rule, is entitled to great weight, if he understands what amount of capacity is sufficient to make a valid testamentary disposition of his property.

"The jury may examine and take into consideration the provisions of the will itself, as containing intrinsic evidence on the question of testamentary capacity; for although you have no right to meddle with the motive or determine the wisdom or justice of any man's disposition of his property as he pleases; yet important evidence may be derived from the provisions of the will, in connexion with the circumstances of the testator at the time, purposes expressed, and objects mentioned, &c. Perhaps the strongest circumstance against this will—that is, against the testamentary capacity of the testator—may be found in the provisions for Mrs. Blair, in connexion with the testimony of Hugh McMasters the scrivener, and one of the witnesses called by the plaintiff to support it. He testifies that when he was called upon by the testator to draw his will, he stated his purpose to be to 'secure a living for Matty,' or to secure Matty (his wife). The testator's wife Matty, was

[McMasters *v.* Blair.]

living, and they had no children.  By law she would be entitled to the one-half of the personal estate, which in this case was somewhere in the neighbourhood of $6000, consisting mainly of bonds and obligations for the payment of money.  By the provisions of the will she would receive interest only during life on somewhat more than the third of the money obligations, without any control of it at her decease.  There were some articles of farming utensils, cows, horses, &c., bequeathed to her by name, but whether to her absolutely, or really to be disposed of to the children of John Blair, is matter of controverted construction by the counsel on this trial.  The will is written without punctuation from the beginning to the end, and it depends upon the insertion of a point what is its true meaning.  If immediately following the word 'pleasure,' it is an absolute disposition of those articles to her.  If the point be placed after the words 'John Blair deceased,' it would seem to be a mere gift to the children of John Blair, through her hands, or perhaps rather insensible and without any intelligent meaning. The most grammatical construction would be that last stated here, inasmuch as the first clause relating to the home, and cattle, &c., seems more naturally connected with the words 'to the children of John Blair deceased,' than the next provision relating to the money, commencing with the words, ' and also,' both being used would seem to indicate the commencement of a new subject.  But we are not called on to give construction judicially, of this part of the will.  It is not submitted to the jury in this case for judicial construction.  It is submitted to the jury for their consideration. The testator had sold his farm and converted it into bonds for the payment of money.  It is urged for the defence, that under these circumstances, the disposition of articles belonging to the farm, of little or no use to her, difficult to dispose of, expensive to retain and keep, and troublesome to manage, would impose a burden upon the widow, rather than secure a living to her, as the money arising from the obligations would do.  The jury will look carefully, then, at the will itself with all its provisions, connected with the circumstances of the testator, his declared ·purposes and objects, and determine for themselves whether there is anything in it so unreasonable, extravagant, or insensible, as to furnish evidence bearing upon the point of capacity, at the time of the execution of the will.

" The law is generally correctly stated in the defendant's first six points, excepting that the language used in the first point is somewhat stronger than we have employed in the general charge ; and to the second point we say that unsoundness of mind shortly before the decease, is not so much a legal presumption of testamentary incapacity at the time of the execution, as it is evidence to a jury to pass upon under all the evidence in the case.

" To the 13th point, it is answered that the provisions of the

will being inconsistent with natural justice, may be a circumstance with the jury, and they must judge from the whole evidence in the case, the force of that circumstance, keeping in view the single question of capacity, at the time of the execution of the will."

The jury found for the defendant, and against the validity of the will.

The errors complained of are the answers of the court to defendants first and thirteenth points, and parts of the general charge.

*D. M. Farrelly* and *Finney*, for plaintiff in error.

*Church* and *Pettis*, for defendant in error.

The opinion of the court was delivered by

LOWRIE, J.—On the evidence put upon our paper-books, the verdict rendered in this cause seems to us so strange and unaccountable, that we are naturally inclined to suppose that there must have been some very grave error in the charge of the court, or that some error of minor importance has been unduly impressed upon the jury. There is the most ample proof that this will was executed according to the forms of law, and not the slightest indication that anybody doubted the testimony of the witness in this regard. There is not the least ground of suspicion that the testator was incompetent, before his last illness, to make a will, or that any undue influence was exerted in procuring him to make this will as it is. The only ground, therefore, on which this will was set aside must have been, and appears to have been, because the jury considered that the testator's mind had become so enfeebled by his sickness when his will was made, that it cannot properly be called his will. He was ill about four days; and we have quite a full account of his mental symptoms during the whole time. Three witnesses express opinions on the state of his mind, on visits made by them on Thursday and Friday. The will was executed on Friday night about two o'clock, and he died on Saturday morning about ten o'clock. One witness thinks his mind was not sound; another that it was weak and wandering; and the physician thought him not capable of reflection on any subject. Yet all of them give facts that show very plainly that there was no improbability that he might have mind and memory enough to make a complete and rational disposition of his property. On the question of the testamentary capacity of a dying man, the fact of an occasional flightiness or wandering of intellect during his sickness, is generally of very slight importance, and is scarcely any evidence that that state continued; for usually it is an accidental abnormity, very easily accounted for by temporary circumstances. If we find an obstruction in a street or crowded tho-

[McMasters *v.* Blair.]

roughfare, we do not presume that it will remain there. Notwithstanding such accidental mental disorder, the presumption is still that a man is competent when he makes his will, and the contrary ought to be proved before the jury can find it. Then, on the other hand, we have seven witnesses who knew the testator intimately, and who had the fullest opportunity of observing him during the whole day and night preceding his death, who recount his words and conduct with great particularity, and all of whom believed him to be of sound and disposing mind, and give most abundant facts in proof of it. How such testimony could be set aside, when every witness seems to have been respectable, and no serious attack is made on the credibility of one of them, seems to us quite astonishing. If this example were to be followed in the administration of the law, every dying man's will would be in danger. The opinion of some witnesses, that the testator's mind was unsound, or flighty, or wandering, or torpid, when they saw him, ought to go for nothing against such facts as are related by those who saw so much of his last hours. The opinion that he could not reflect is disproved by the will itself, and by the testimony of Hugh McMasters, showing that he well knew all about his property, and how he desired to dispose of it. Very often a disposing mind needs very little power of reflection, because it has but little to reflect about. The work of reflection has been performed before; and when the time of making the will comes, memory alone is wanted in order to dictate the results. Wills written *in extremis* are not necessarily, and perhaps not often, first thought out and arranged then. And though the testator's mind might be very dull when called to subjects in which he took no interest, it might not be at all so on the subject of his will, which it is very apparent he was quite desirous of making. He might take no interest in medical attendance, which he regarded as hopeless, and yet wake up fully to the performance of the duty of making his will. If, when he dictated his will, his mind and memory were active enough to enable him to understand and direct the business in which he was engaged, he was not intestate. That witnesses should differ very widely in their opinions of a testator's competency, is not at all surprising; and, generally, this is no impeachment of the honesty of any of them. Much of this difference arises from the fact that the witnesses do not measure testamentary capacity by the same standard. Few of them either know the legal standard, or have taken interest enough in the question to settle any definite standard in their own mind; and hence their opinions are necessarily changeable, and very apt, even unconsciously, to take their direction from the interest felt in the persons litigating the question.

We would not say that the general instructions given by the

.[McMasters *v.* Blair.]

court are so variant from what we have already said, as to require any correction. But then the defendant's counsel requested a specific instruction that testamentary capacity "consists in ability to reflect on his business affairs, understand the nature of what he is doing, with a recollection of all his estate, his family relations in life, as well as their condition in general, and the probable effect the proposed disposition will have, and to collect this all in one view." We need not point out the several errors in this definition. Its extravagance is manifest when we notice that a man may not choose to dispose of any but a very small portion or part of his estate by will, or he may have long ago concluded to devise all of it to a single person, and then he will not need to collect all those circumstances into one view. But the court affirmed this definition with this qualification, "excepting that the *language* used is somewhat stronger than we have used in the general charge." Surely the jury would understand from this that the point put was about right in its *sense*, and might therefore be affirmed without any specific exception. Then the jury were to be satisfied that the testator, when he made his will, was able to collect all his business, his family, his relations, and their condition, and the effects of his will, with one review. This was requiring too much. To understand in detail all he is about, is quite sufficient. Then the court criticises the provisions of the will. The jury ought to look at them; and if a will is quite irrational, it requires but little or no evidence to set it aside. But how it is possible to find any such evidence of incapacity in the provisions of this will, we cannot imagine. The testator is said to have been an eccentric man; but such a man is not intestable; and if he make an eccentric will, it cannot be set aside. A narrow-minded, jealous, ill-tempered, or superstitious man may make a will, and it is not to be set aside because it accords with his character. Every man has his peculiarities as part of his freedom, and this would be encroached upon, if he could not carry them out in his will. The law allows them, and it would be the mere tyranny of a general opinion, or of an opposite peculiarity, that would set aside a will on their account. Nothing but mere arbitrariness can do so. Peculiarities may be evidence to support, as well as to attack, a will, according as they are compatible or incompatible with the testator's character.

One part of the will was misinterpreted by the court; and on this misinterpretation it was submitted to the jury as irrational. This was partly the scrivener's fault; but to our mind it is very plain that the testator bequeaths his horses, carriage, furniture, &c., to his wife, to be disposed of according to her pleasure, and thus arranges for the security of $2120 for her benefit for life, and then for his brother John's children.

[McMasters v. Blair.]

We see no evidence of insanity in his giving to his wife all his movable property, even though part of it consisted of farm stock and utensils; for if she could not use them, she could sell them and use the proceeds.

Nor is it evidence of insanity that he gave his wife less than she might now claim by law, provided he gave her enough to live according to his ideas of what was proper for her. Perhaps his allowance to her was liberal, measured by their usual mode of life: but even meanness is nothing like insanity. It is no evidence of insanity that he makes preferments among those who are naturally or legally his heirs; for this is the main purpose of a will.

These views suffice for the correction of all the errors in the charge of the court, and they alone would require this cause to be sent back for a new trial. But there is another point that is totally fatal to the proceeding.

This widow, the defendant, has had a very ill adviser, who appears to have no interest in the estate, but is well disposed to stir up strife. Without this she could not have been led into this controversy. She has no right to contest her husband's will, for she is not bound by it. She may have her statutory dower, and her statutory share of his personal estate, if she does not like the will, and she must leave it to his heirs to dispute the will. Her will is stronger than his so far as it affects her right, and that far she may set it aside by a simple election; but she has no right to interfere with his disposition of the residue of his estate. Her contingent right of administration is not an interest in the estate entitling her to dispute the will; but only the legal provision for its settlement, in case there be no will.

> Judgment reversed and judgment in favour of the plaintiff for costs.