OF THE

STATE OF IOWA

AT

DES MOINES, SEPTEMBER TERM, 1908,

AND IN THE SIXTY-SECOND YEAR OF THE STATE.

---

W. F. HANRAHAN, Executor of the Will of THOMAS O'TOOLE, SENIOR, Appellee, v. THOMAS O'TOOLE, JUNIOR, AND OTHERS, Appellants.

139 229
f144 406

**Wills:** MENTAL CAPACITY: EVIDENCE. Mere mental weakness is not sufficient to render a testator incapable of making a will so long as he retains a reasonable comprehension of the act he is engaged in, the extent of his property and the claims of relatives and friends entitled to share in his bounty. Evidence held insufficient to show a condition of mind incapacitated to make a will.

**Exclusion of evidence.** Where apparently immaterial evidence is offered with no explanation or offer to show a state of facts which would make it relevant, its exclusion is not erroneous.

**Same.** Rejection of evidence as to testator's condition of mind because not confined to the time at or about when the will was executed was not an abuse of discretion; especially where there were a number of other witnesses possessing equal knowledge on the subject who testified to his mental condition.

229

**Same.** The rejection of evidence which could be of no advantage
to the party offering it is not a matter of which he can complain.

**Communications with one since deceased.** The statute prohibiting
personal communications between a witness and one since
deceased relates to the competency of the witness and not the
testimony; so that the statute cannot be invoked in aid of an
objection that the evidence was incompetent.

**Testamentary capacity:** REFUSAL OF INSTRUCTIONS. Where the instructions given by the court were a reasonably sufficient statement of the law on the subject of testamentary capacity, a
refusal of requested instructions on the same subject was
proper, even though they may have correctly stated the law.
The court's instructions are held sufficient.

**Same.** It is not essential to testamentary capacity that the testator have a complete and exhaustive knowedge of all his property; it is sufficient if he has capacity enough to comprehend in
a general way the nature and extent of his estate, the objects
of his bounty, and the character of his act.

**Undue influence:** BURDEN OF PROOF. The burden of showing undue
influence in the execution of a will is upon the party alleging
it, and this burden is not shifted by a simple showing that the
person who drew it was the son-in-law of the testator, for
whom he had respect and confidence, and that members of his
family received valuable legacies; there must be a showing in
some manner that the testator relied upon the scrivener for
guidance and that his confidence was abused.

*Appeal from Clinton District Court.*— HON. J. W.
BOLLINGER, Judge.

TUESDAY, SEPTEMBER 22, 1908.

PROCEEDINGS for probate of will. Verdict for proponent; and will admitted to probate. Contestants appeal.
*Affirmed.*

*Ellis & McCoy, Skinner & Co.,* and *M. V. Gannon,* for
appellants.

*S. C. Scott* and *Wolfe & Wolfe,* for appellee.

WEAVER, J.— The contestants, who are children of the
deceased, contest the admission of his will to probate on the

ground that said testator was mentally incompetent to make a valid disposition of his property, and that the instrument was procured by fraud, duress, and undue influence exercised by W. F. Hanrahan, the executor named therein, and by his wife and children.   Other grounds are alleged, but those we have named are alone material for our consideration.

I.   At the close of the evidence, the trial court withdrew from the jury the issue of fraud and undue influence on the ground that the evidence was insufficient to justify

1. Wills: mental capacity: evidence.

a verdict for the contestants thereon.   The error assigned upon this ruling will be considered in another paragraph of this opinion.   Referring now to the claim made by the contestants that Thomas O'Toole, Sr., was mentally incapacitated to make a valid will, it may be said that the evidence fairly tends to show the testator to have been a man of at least average ability and intelligence, and, while having but limited education, had proved himself a good business man, and had accumulated a considerable amount of property.   He had six children who had reached maturity, and were all married, with families and homes of their own.   His wife had been dead for several years.   Prior to the date of his will, he had given a farm to each of his four sons, Lawrence, John, Thomas, and James, also to his daughter Mary, wife of W. F. Hanrahan, and had given $1,500 each to his daughters Christie Rosenberg and Margaret Dunn.   The estate remaining at his death amounted in value to perhaps $25,000. In the spring of 1906 the testator was about eighty-three years of age, and there is evidence to the effect that his mind had in some degree yielded to the weaknesses usually attendant upon old age.   He was at times depressed, was easily moved to tears, would dwell unduly upon trivial matters, showed childish interest in horses, dogs, chickens, and birds, was forgetful, and at times had unfounded fears that there were intruders in or about his house at night.   At one time he proposed to marry a woman of his acquaintance, but

through the interposition of his relatives, including the Hanrahans, the engagement was broken off. But there is little or no evidence that he failed in ordinary business sagacity, or became incompetent to manage his own business affairs. His son-in-law, W. F. Hanrahan, was a merchant and man of business experience, and the testator doubtless held him in esteem and respected his judgment, and sometimes consulted him in business matters. In April, 1906, he was in failing health, and on the 26th day of that month executed the will in controversy, and on May 20, 1906, he died. The will appears to have been drawn by Hanrahan, but there is nothing in evidence to show the particular circumstances under which it came to be written. The instrument is very informal, but not difficult of interpretation. Its provisions are in substance as follows: First. He gives to the children whom he had already provided with farms the sum of $50 each. Second. To his daughter Christine, to whom he had already given $1,500, he bequeaths $500, and the sum of $1,000 to his daughter Margaret, who had received a like advancement. Third. To his son James O'Toole he authorizes his executor upon certain conditions to surrender an indebtedness secured by a mortgage. Fourth. To a daughter of one of his sons he gives $500, and to the son of another his horse, harness, and carriage, and to a daughter of Margaret Dunn $1,000. Fifth. To the local Catholic Church he gives $500 for the purchase of a bell, and to the parish priest $100 for masses for the repose of his soul. To the children of his daughter Mary Hanrahan he makes various bequests aggregating $13,200, and, in addition thereto, leaves his homestead to be equally divided between Mrs. Hanrahan's three daughters. For the payment of the legacies provided by the will, he directs or requests the sale of certain lands, concerning a part of which the title had been placed in W. F. Hanrahan "for certain reasons," the nature of which is not stated. The will contains no residuary clause. There is ample evidence in the record to sustain

the finding of the jury that at the date of this instrument Thomas O'Toole, Sr., was of sufficiently sound mind to make a valid will.

While, as we have already seen, it may be true that his mental powers had become somewhat weakened, it is shown quite conclusively that he was still capable of intelligent comprehension of his business, and knew the nature of the instrument executed by him. The will itself affords strong evidence of his knowledge and memory of the natural objects of his bounty, and all are mentioned and remembered therein with varying degrees of liberality. It gives also evidence of his general comprehension of the nature and extent of his estate; and the minuteness with which he directs its distribution among his children and grandchildren is not the characteristic of a mind far gone in senility. He attended to his own business, looked after his own bank account, and, so far as is disclosed in the record, was no more dependent upon the advice or assistance of agents or counselors than is the average man of his education, experience, and station in life. That a man is not rendered incapable of making a good will by mental weakness merely, so long as he retains reasonable comprehension of the act in which he is engaged, and of the extent of his estate, and the claims, if any, which his family or friends have upon him, has been too often decided to call for discussion or illustration at this time. See *Perkins v. Perkins,* 116 Iowa, 253, and cases there cited. Applying the rule of these authorities, there is no reason for interfering with the verdict of the jury upon the question of the testator's mental capacity, unless there be merit in some of the exceptions taken to rulings made by the court upon the trial.

One of the contestants having testified that a few years before his decease his father contemplated marriage, and that 2. EXCLUSION OF EVIDENCE. some trouble arose because of opposition thereto by the family, the witness was asked by his counsel, " State whether or not that marriage was con-

summated," and an objection to the question for immateriality was sustained. We presume that by this question counsel meant to inquire whether the proposed marriage ever took place. As there was no claim by any one that Mr. O'Toole did remarry, we think the inquiry was clearly immaterial. This offer was followed by the further questions: "Didn't your father during October, 1905, contemplate marriage with Mrs. Dillon?" Again: "State whether or not he was engaged to Mrs. Dillon." To both of these questions objection was sustained. Counsel do not claim in argument that the matters sought to be elicited by these questions would have any tendency to show unsoundness of mind, but they suggest that if the engagement existed, and was broken off under the influence of Hanrahan, that fact would have a tendency to show confidential relations between him and the testator. Even if that be correct, which we do not concede, the questions asked the witness did not indicate to the trial court any purpose on part of counsel to connect Hanrahan with that episode in the career of the testator, and counsel made no explanation or offer to show such state of facts. Under such circumstances, there was no error in sustaining the objection. Though not in answer to these questions, witness did say that "Mrs. Hanrahan and most all of us opposed the marriage"; thus indicating that at that time in face of the common danger that their father might marry, and thus divert a fraction of his estate from themselves, the children all united to defeat his purpose, and apparently succeeded. Such a circumstance tends to negative, rather than support, the theory that any one of them was then enjoying his special confidence.

The same witness, after stating his knowledge and observation of his father's condition, conduct, and conversation during the latter part of his life, was asked: "From the facts you have seen and detailed, would you say your father was of sound mind, meaning whether he was of sound or unsound mind or otherwise

3. SAME.

during this period?" Objection to the question was sustained, and the answer was excluded. In our opinion the answer could well have been admitted, though strictly speaking the question was open to objection, and technically there was perhaps no error in the ruling. As will be observed, the witness was asked for his opinion of the soundness of the testator's mind "during that period," and not as to his mental condition at or about the time the will was executed, or even as to a time prior to its execution, and the court could without abuse of discretion refuse to admit the answer. But, even if there was error in the ruling, we would not be inclined to reverse on that account. There was a large number of witnesses for the contestant whose knowledge of the testator was as intimate and whose opportunities to note his condition were as good who testified freely on the subject, and gave their opinion of his mental soundness or unsoundness, and we think it very clear that the addition of this one witness' opinion would have had no perceptible influence on the result of the trial.

On December 6, 1905, during the testator's lifetime, Hanrahan wrote to Lawrence O'Toole, who resided in another state, saying: "Not hearing from you after Mary wrote you, I was speaking with your father to-day: He with the Bal of us would like to have you Come Back & Live here again: He says he will let you have the McDermott place for what it cost him, $67.00 an acre, or the Erwin place for $75.00; half down & Bal on time at 6%; a very good offer; if you buy the Erwin Place & Build & improve some on it you could sell again if you wanted to for about $90.00 to $100.00 per acre; how is this if you wrote your father & tell him to hold the Erwin place & you would come and visit at Christmas & make the Deal the McDermott place is rented but the Edwin place ain't yet. Now is your time to act on this & the Erwin place is the best for you for Bal of your days." Contestants offered this letter in evidence, and it was ruled

4. SAME.

out. In support of that offer, counsel say: "This exhibit tended to establish the close confidential relations between W. F. Hanrahan and Thomas O'Toole, Sr. It discloses how closely Hanrahan was identified with the business of Thomas O'Toole." We confess our entire inability to draw any such meaning or inference from this letter. On the contrary, it seems rather to be an implied admission that the old gentleman not only knew what he was doing, but still held the reins of his affairs firmly in his own hands. The writer of the letter appears to have approached testator in his brother-in-law's interest concerning the purchase of. a farm, and in this communication reports to the latter the result of the interview. He assumes no authority whatever, but, having reported the terms on which the testator would sell his farm, advises the brother-in-law to address his father directly on the subject. It is difficult to imagine a good reason for an objection by the appellees to this kind of testimony; but its exclusion is not a matter of which appellants can complain.

One of the daughters of Mrs. Hanrahan, and a legatee under the will, was examined as a witness by the proponent, and identified certain letters received by her from the testator during the winter preceding his death. These letters were offered in evidence as tending to prove the mental soundness of the writer. They were objected to on part of the contestant as "incompetent, irrelevant, and immaterial." The objection was overruled, and error is assigned thereon. In this court it is argued that these letters were personal communications between the witness and the deceased, and should have been excluded under the provisions of Code, section 4604. Counsel overlook the obvious fact that the objection made on the trial was to the competency of the testimony, and not to the competency of the witness under the statute. We have frequently held that the statutory objection will not be considered in this court if not first raised in the court below. We do not decide

5. COMMUNICATIONS WITH ONE SINCE DECEASED.

that the letter would in any event have been objectionable under the statute. That question is not before us. *Schmidt v. Littig,* 69 Iowa, 277; *Ball v. Railroad Co.,* 74 Iowa, 135; *Denning v. Butcher,* 91 Iowa, 425. Other points made with respect to this branch of the case we find to be without merit, or are governed by the conclusions already announced.

II. The contestants asked several instructions to the jury defining mental unsoundness as affecting capacity to make a valid will. These were refused, and, on the court's own motion, the following were given:

6. TESTAMENTARY CAPACITY: refusal of instructions.

(7) Within the meaning of the law in this case, a person who has a sound mind — that is, has sufficient mental capacity to make a valid will — is one who has an intelligent knowledge of the nature of the instrument he is executing, and has mind enough to know and comprehend in a general way the natural objects of his bounty, the nature and extent of his estate, and the distribution he wishes to make of his property. So long as he has such mental power, old age, disease, and weakness of memory are not sufficient to warrant a jury in finding him mentally incompetent to make a will. It is not necessary that testator should have sufficient mental capacity to make valid contracts or do business generally, or to engage in complex and intricate business matters.

(8) Testimentary incapacity, or unsoundness of mind, that is a mind insufficient to make a valid will, does not necessarily require that the person shall be actually insane. Weakness of intellect, whether it arises from extreme old age, from disease, bodily infirmity or suffering, or from all these combined, may render the testator incapable of making a valid will, providing such weakness really disqualifies him from knowing and appreciating the nature, effect or consequences of the act in which he is engaged. Eccentricities, peculiarities, oddities, or the like, or the weakness of mind ordinarily attendant upon old age, do not of themselves necessarily establish a lack of testamentary capacity; in other words, disease of mind is not necessary, for weakness may incapacitate it under conditions above stated.

If the quoted instructions are a reasonably sufficient statement of the law upon this point — as we think they are

— then it is a matter of no moment whether the instructions asked might not have been properly given. The difference between the statement of the law given by the court and that which was asked by the appellants is chiefly in the emphasis which the latter lays upon certain features of the rule stated. It is a safe general rule for the trial court to decline to give instructions in the very language in which they are asked by counsel; for even in the statement of correct principles they are quite sure to magnify some of its features at the expense of others. The case before us is not one of the rare exceptions to the rule here stated. The instructions given fairly reflect our own decisions upon the question of testamentary capacity, and are, we believe, sustained by the great weight of authority. *Perkins v. Perkins,* 116 Iowa, 253; *Webber v. Sullivan,* 58 Iowa, 260; *Meeker v. Meeker,* 74 Iowa, 352; *Fothergill v. Fothergill,* 129 Iowa, 93; *Gates v. Cole,* 137 Iowa, 613.

Counsel indulge in much criticism of the words " in a general way," which the court uses in describing the degree of knowledge and comprehension which the maker of a valid will should have of his estate and the natural claims upon him of members of his family, and insist that such knowledge and comprehension must be " full," and that this legal requisite is unduly weakened or destroyed by the phrase " in a general way." As authority for this contention, we are cited to the *Meeker* case, *supra;* while the appellees point out that the words thus objected to are quoted from the *Perkins* case, *supra.* There is no inconsistency between these precedents. No one will contend that it is essential to testamentary capacity that the testator shall have complete and exhaustive knowledge and comprehension of all the items of property comprising his estate. Many, if not most, men of large wealth invested in various enterprises, and of whose mental soundness and business sagacity no reasonable question could be raised, would be unable to stand such a test. It is sufficient that he have reasonable

7. SAME.

mental grasp of his own financial condition and capacity to understand the natural obligations, if any, which rest upon him in favor of his family and friends. Such knowledge and comprehension are "full" within the meaning of the law, though they be general rather than specific in character. In other words, if he has the capacity to form a rational judgment of his estate and the manner in which he wishes to dispose of it, he may make a valid will, although his judgment may, in fact, be at fault, and the will so made may discrimnate unjustly between his children and other beneficiaries. The property is his to give or to withhold as shall to him seem fit and proper. He knows better than can be known to any other person the merits and demerits of his several children and relatives, and their several claims upon his favorable consideration, and, when in substantial compliance with law he has made provision for the distribution of his estate, it becomes the duty of the court to see that it is executed accordingly, unless it be duly established that at the date of his will his mind was so far enfeebled or destroyed that he lacked intelligent apprehension of the act in which he was engaged. Such is the plain purport of our own cases of which leading examples have already been cited. See, also, *Appeal of St. Leger,* 34 Conn. 434, (91 Am. Dec. 735); *Stancel v. Kenan,* 33 Ga. 56; *Watson v. Watson,* 41 Ky. 74; *Lodge v. Lodge,* 2 Houst. (Del.) 418; *Crolius v. Stark,* 64 Barb. (N. Y.) 112; *Reichenbach v. Ruddach,* 127 Pa. 564 (18 Atl. 432); *Couch v. Gentry,* 113 Mo. 248 (20 S. W. 890); *McMasters v. Blair,* 29 Pa. 298. Quite in point, also, is the very recent case of *Moore's Estate* (Mich.) (117 N. W. 329). There was no error in the instructions given by the trial court, and the instructions asked by the contestants contain no correct proposition of law which is not substantially covered by those given.

III. The appellants rely very largely for a reversal of the judgment below upon the withdrawal of the issue of undue influence from the jury. We have read the record

with special reference to this assignment of error, and
8. UNDUE INFLU-   agree in the conclusion that the ruling was
ENCE: burden
of proof.         correct. There is an utter absence of any testi-
mony in the record tending to show any coercion of the
testator, actual or attempted, by any person in the making
of this will. There is nothing to show any solicitation or
importunity by Hanrahan or by members of his family or by
any person in their behalf to secure a share small or great
in the testator's bounty. Nor is this fact seriously disputed
by counsel, but the proposition relied upon is that W. F.
Hanrahan stood in a relation of special confidence to the tes-
tator; and, as he was the scrivener who drew the will in
which members of his immediate family are made benefi-
ciaries, there is a presumption of undue influence, and the
burden is upon him as proponent to show the absence of such
influence. That there may be circumstances under which
the proponent of a will must assume the burden of removing
an unfavorable presumption of this kind may be admitted,
but this is not shown to be a case of that nature. In the first
place, there is no showing of such relation of confidence be-
tween the testator and Hanrahan as the rule cited by counsel
contemplates. It is true that Hanrahan was the testator's
son-in-law, but that fact alone is not sufficient to justify a
presumption of confidential relations between them. There
are some suggestions in the record indicating that Mr.
O'Toole had considerable respect for the judgment and busi-
ness ability of Hanrahan, but that he looked to him or relied
upon him for guidance or was in any manner subject to his
control or leadership is nowhere shown. There is no testi-
mony that the father and son-in-law were then standing in
the relation of principal and agent, or were so intimately
associated in other business, social, or family affairs as to
justify a presumption of undue advantage on part of the
latter. The fact of family relationship or of the existence
of the confidence and reliance which persons ordinarily re-
pose in acquaintances and friends whose constancy and in-

tegrity they have tried will not justify a presumption of undue influence in the utter absence of any further showing that such trust has been abused. · In *Denning v. Butcher,* 91 Iowa, 438, we had under consideration the question here presented, and refused to follow the extreme precedents on which appellants here rely, and held that the giving of a large legacy to one who had long been the testator's confidential adviser did not cast the burden upon the legatee to negative the exercise of undue influence upon his part. In that case the testator was an old man debilitated by excessive intemperance. He had long lived in the family of one Cowley, who was his agent and trusted business manager, and, while Cowley did not draw the will, he did call the person who drew it, was present when it was made, and read it over before it was executed, and yet we said these facts " fall far short of making even a prima facie case of undue influence." We could well rest the decision of the present case on the authority of the precedent just cited, for it discusses the controlling question with the thoroughness and wealth of citation which were characteristic of the work of its author, Mr. Justice Kinne. But see, also, *Reeves v. Howard,* 118 Iowa, 128; *Chandler v. Jost,* 96 Ala. 596 (11 South, 636); *Norton v. Paxton,* 110 Mo. 456 (19 S. W. 807); *Berberet v. Berberet,* 131 Mo. 399 (33 S. W. 61, 52 Am. St. Rep. 634); *McMaster v. Scriven,* 85 Wis. 162 (55 N. W. 149, 39 Am. St. Rep. 828); *Lee v. Lee,* 71 N. C. 139; *Wright v. Howe,* 52 N. C. 412; *Post v. Mason,* 91 N. Y. 539 (43 Am. Rep. 689); *Carter v. Dixon,* 69 Ga. 82; *Waddington v. Buzhby,* 45 N. J. Eq. 173 (16 Atl. 690, 14 Am. St. Rep. 706). The burden is upon the party alleging undue influence, and that burden is not removed by a simple showing that the person drawing the will is the son-in-law of the testator, and that by its terms his children receive valuable legacies. It may be a just ground of suspicion; but, without proof of other facts and circumstances confirmatory of such suspicion, there is nothing on which a verdict for contestants

could be upheld. The verdict on this issue was rightly directed for the proponent.

There is no reversible error in the record; and the judgment of the trial court is *affirmed*.