JASPER RANNE, Appellee, v. FRANK HODGES et al., Appellants.

WILLS: Testamentary Capacity—Unsoundness of Mind—Evidence—
1 Sufficiency. Evidence reviewed, and held ample to carry to the jury the question of testator's sanity.

**WILLS:** Testamentary Capacity—Evidence—Unequal Distribution. Inequalities of distribution between testator's children and stepchildren, along with any proper explanation thereof, are proper subjects for the consideration of the jury in determining the actual condition of the testator's mind.

**EVIDENCE:** Opinion Evidence—Non-Experts—Insanity—Nature of Facts Detailed—Wills. Justification for the opinion of a non-expert that a testator was of unsound mind is found in a detailing by the witness of facts and circumstances (a) which are in *some* fair degree extraordinary and unusual, and (b) which *tend* to indicate an unsound mind. Unusual circumstances and conduct in the life of a testator reviewed, and held to furnish ample basis for the opinion by a non-expert that testator was of unsound mind.

**WILLS:** Testamentary Capacity—Evidence—Ignoring Children—Strangers As Beneficiaries. Principle recognized that a jury may well conclude that it is not rational for a testator to ignore his own children in the disposition of his property, and to bestow his property on stepchildren, and quite largely on an aged second wife who had no need for such an unusual amount of property and had accumulated no part of it.

**WILLS:** Testamentary Capacity—Old Age. Principle recognized that old age is not, of itself, evidence of mental incapacity.

**EVIDENCE:** Opinion Evidence—Hypothetical Questions—Form and Accuracy. Hypothetical questions need not be framed with technical accuracy. It follows that misstatements in the recital of facts do not render erroneous the reception of the opinion, especially when the question is lengthy and there is no objection specifically pointing out such misstatement.

*Appeal from Mills District Court.*—A. B. THORNELL, Judge.

WEDNESDAY, MAY 16, 1917.

REHEARING DENIED, SATURDAY, SEPTEMBER 29, 1917.

THE will and two codicils were presented for probate. Objections were interposed by decedent's son. Probate was denied, and proponents appeal.—*Affirmed.*

*John Y. Stone, C. E. Dean, A. E. Cook* and *Cochran & Barrett,* for appellants.

*Genung & Genung* and *Saunders & Stuart,* for appellee.

LADD, J.—I.  Henry Ranne was born March 8, 1819. He died November 23, 1914. His first wife had departed this life some time in 1896, and he was married again July 19, 1898.  He was then over 79 years of age and she 54, again confirming a saying on high authority "that the mating instinct does not necessarily wane with advancing years." *Perkins v. Perkins*, 116 Iowa 253.  The second wife died September 3, 1914, leaving four children by a former husband surviving, the proponents in this case.  He outlived her but a few months, leaving six children, one of whom, Jasper Ranne, is contestant, and another of whom, Catherine Whiteside, joined proponents by petition of intervention.  On October 3, 1906, a paper purporting to be the will of decedent was signed by him in the presence of witnesses, giving to his widow one third of his estate, to a daughter, Ellen Boyd, $300, and the residue, share and share alike, to his other children, William, Henry and Jasper Ranne, Mrs. Whiteside and Alice Weaver.  On May 11, 1909, a paper purporting to be a codicil was made, directing that, in lieu of the specific legacy to Mrs. Boyd, she share the residue of the estate equally with the other children.  A paper purporting to be a second codicil was signed November 19, 1909, changing the will and first codicil so as to give his three daughters $5,000 each, his son William, $3,000, his son Henry, $2,000, his son Jasper, $1,000, and $2,000 to be divided among the children of Jasper, $1,000 to each of the children of Catherine Whiteside, $2,000 to his wife's daughter Nora, and the homestead and residue of the estate to his wife.  The estate at his death amounted to $61,000 and some accrued interest.  Under the last codicil, then, $27,000 of this would pass to decedent's children, and $34,000 to his stepchildren, of which $10,000 would pass to Nora Bourgeaux and $8,000 to each of the other

three.   The circumstance that one of his children, Mrs.
Whiteside, joined proponents, is explained by the circum-
stance that she and her four children would take $9,000
were the will to be admitted to probate, and little if any
more if it were found to be invalid.   The will, and also the
last codicil, provided that any beneficiary contesting either
should be cut off and take nothing thereunder, and this may
account for there being but one contestant.   His objec-
tions, duly filed, were that, when making the will and cod-
icils, and. for many years prior thereto, decedent was of
unsound mind, and that these were the product of undue
influence.   No evidence bearing on the latter objection was
adduced, and that issue was withdrawn from the jury.

1. WILLS: testa-
mentary capac-
ity: unsound-
ness of mind:
evidence: suf-
ficiency.

The proponents contend that the evi-
dence was insufficient to warrant the sub-
mission of the remaining issue to the jury.
The will was made when testator was nearly
88 years of age.   The only change from dis-
tribution without a will consisted in reducing a daughter's
share of the estate to $300 and giving the wife one third
of the property, instead of leaving her to elect between
that and the homestead for life.   The inequality as to the
daughter was eliminated in the first codicil.   The second
codicil practically abandoned the will and first codicil, and
in effect the second codicil was a new will.   Besides dis-
criminating between his own children, he therein gave the
larger part of his estate to his wife, who was then 65 years
of age, and his stepdaughter.

2. WILLS: testa-
mentary capac-
ity: evidence:
unequal dis-
tribution.

The inequalities, if any, of the will and
codicils, together with any explanations
appearing, were appropriate for the jury's
consideration, in connection with other evi-
dence, as bearing on the condition of the decedent's
mind.   *Manatt v. Scott,* 106 Iowa 203; *Milcham v. Mon-
tagne,* 148 Iowa 476; *Serening r. Smith,* 153 Iowa 639;

*Trotter v. Trotter,* 117 Iowa 417.   After the marriage in 1898, decedent, with his wife and her daughter, continued on the farm until the spring of 1906, when they moved to Glenwood, where they lived the remainder of his life.   He had sold his farm the year previous at a price of about $10 per acre less than it was worth, according to some witnesses, and had paid $4,500 for his new home.   All of his property except the home had been reduced to money, and this was loaned on certificates of deposit at four per cent per annum, the amount being distributed among four different banks.   He appears to have collected the interest for a year or two, and thereafter this service was rendered by his stepdaughter.

II.   Contestant relied on three classes of testimony: (1) that of non-experts, who related incidents and based their opinions thereon; (2) that of physicians having personal knowledge of decedent; and (3) that of a physician who based his opinion on a hypothetical question.   Six or seven witnesses related incidents and expressed the opinion that in 1906 he was of unsound mind.   The incidents, in addition to ordinary forgetfulness due to old age, were: That he directed a neighbor to bring over hogs he said he had bought of him, when in fact there had been no deal; that he sold a cow to a neighbor, and when he came for it, denied the sale; inability to recognize acquaintances he had known 20 to 45 years; saying that his own son had been stealing his corn; pushing back and forth on posts to ascertain whether solid, day after day; seeing brick castles in the air, and asking witnesses if they could not see them; proposals to erect a brewery; asserting that his cattle were lost and were stolen, when he had none; claiming he had lost a horse, when he had none to lose; buying a team without looking them over for blemishes or examining their mouths or inquiring as to their age; paying for work, and immediately thereafter offering to pay again; interrupting workmen repeat-

edly while employed, by offering to pay them; directing work to be done, and after it was done, denying having given the directions; inability to appreciate relationship of grandchild; that he wandered about aimlessly, and wife had to turn him back to house; asserting that rails had been stolen, when he had none; beginning conversation and before response, turning away; talking of going west and taking homestead; saying he had not enough hogs to follow cattle, when he had neither; saying that others let cattle through gate, when there were no cattle to go through; and the like. Decedent had been a farmer all his life, and the unusual circumstances related were of a kind likely in case of a farmer, and were of more or less significance, as the witnesses and jury might have viewed them. Several witnesses related incidents, but expressed no opinion. Of course, the weight to be given to the opinions of the several witnesses depends largely on the incidents recited, and the length and intimacy of their acquaintance. See Schouler on Wills, Sections 133 and 142; *Gates v. Cole*, 137 Iowa 613.

III. Objections were interposed to the expression by several non-expert witnesses of an opinion as to the condition of decedent's mind, on the ground that the facts shown were insufficient as a basis thereof. These must have been somewhat inconsistent in their nature with the idea of mental soundness, as that his acts or conversation were unnatural or unusual or such as would not ordinarily be expected from a person of his character. In other words, there must have been such as tended to support the witness's conclusion. The facts, as is often the case, might have been developed more fully in several instances, but it was only necessary that they be such as tended to indicate an unsound mind. Having in-

3. EVIDENCE: opinion evidence: non-experts: insanity: nature of facts detailed: wills.

dicated some facts which tended to support the opinion to be given, the witness was properly allowed to express such opinion, and its value, as well as the effect of explanatory circumstances, was for the determination of the jury. We are of opinion that facts out of the ordinary and somewhat unusual in their character were recited by each non-expert witness, and that, therefore, the court rightly allowed such witnesses to express opinions based thereon. *Stutsman v. Sharpless,* 125 Iowa 335; *Erwin v. Fillenwarth,* 160 Iowa 210; *Spiers v. Hendershott,* 142 Iowa 446.

IV. Several physicians were called on behalf of contestant, and, of these, Dr. Campbell had treated decedent and members of his family, especially his first wife. She had become insane, and was confined to a room so arranged as to protect her and at the same time keep her comfortable. She had continued in that condition about a year. Decedent cared for her, and the physician testified that, though he had been a firm, robust and outspoken man, he underwent changes after 1890; that he "was always a very robust and outspoken man and very firm, but in the latter years that firmness had left, and he seemed to—well, have a different— I don't know how I can express it. I know that he seemed to be a changed man. He didn't seem the same in his home as he formerly was when he was younger. I didn't see any marked symptoms of any insanity or anything of that kind, but he wasn't the same man that he was."

The deposition of Dr. Corbin was taken that, though now a resident of Oklahoma, he had resided at Malvern and treated decedent as an osteopathic physician during the winter of 1904 and 1905. These treatments were given from 4 to 5 times a week, in 3 courses of 4 to 6 weeks each. He testified that at the time he was "suffering with a toxic condition due to persistent constipation, * * * his vitality was low, memory bad, circulation poor, due to an organic heart trouble, with arteriosclerosis or hardening

of the arteries. After getting his bowels active, elimination greatly improved, the toxic symptoms were relieved, and his memory would become better. The disease was progressive. The tendencies in these cases is senile softening of the brain, with mental decay and apoplexy. In my mind, he was a person of unsound mind when I treated him."

Dr. Rush, also an osteopathic physician, accompanied Dr. Corbin and assisted at his examination. He testified that thereat decedent was indifferent about answering questions and did not seem to be interested; that he did not think decedent "had reached a point of being absolutely of unsound mind;" that he was suffering from obstinate constipation; that they "discovered some valvular lesion of the heart," but did not know what it was, but concluded there "was an insufficient valve in the heart;" that "there were symptoms of kidney disease—there was an increase in the structural framework of the kidneys." The witness would not say that he was of unsound mind, but would say that he was showing decided symptoms of mental degeneracy and mental senility.

In 1909, Jasper Ranne applied to the court for the appointment of a guardian of decedent. An affidavit of his physician appears to have been attached to a motion for continuance, or at least as showing his inability to attend trial, and thereupon the court designated four physicians to examine decedent. Of these, Dr. Scott had known him since 1885, though he had never treated him. He testified:

"I made that examination by the direction of the court. He was senile; senility is a condition where a person is worn out and exhausted mentally and physically. The cause of his senility was a marked case of arteriosclerosis, hardening of the arteries. That would produce a very weakened condition of the brain, owing to the imperfect supply of blood to the brain. I knew Mr. Ranne before he moved to Glenwood. I met him quite often and had an

opportunity to observe him. When I first knew Mr. Ranne, he had a very bright mind, I thought, earlier, when I first came to Malvern. Later on, just prior to his moving to Glenwood, he was very forgetful, and could not remember anything. That condition was to a very marked degree. He talked to me about being married, going to get married, and I talked with him after he was married. He told me about it three or four times. I did not ask him anything about it. I was not his family physician; I never treated him. We were quite friendly. I would not consider him of sound mind at that time. Arteriosclerosis is a progressive disease, and one that is not curable; the patient gets worse in almost every instance. I did not see him after he left Malvern, until I saw him in this examination. Q. Doctor, tell the jury from your observation of Mr. Ranne, just prior to his moving to Glenwood as you have testified,—what do you say would be his probable condition about during 1896, 1897, 1898 and 1899? A. Gradually growing worse, I should say. In my opinion there would be no time between the dates mentioned when his mind would be sound. At the time I examined him in April, 1910, he was in bed, and in response to questions, he didn't seem to realize what I asked him; he didn't answer, and I think either his wife or myself told him that Dr. Scott was there from Malvern and asked him if he would like to talk with him, and he didn't remember me at all; he didn't remember who I was; I couldn't get anything out of him at all,—that is about the facts, as far as I could see; he did not seem to know anything. I should pronounce him wholly senile at that time."

Dr. Cole, another of those appointed, testified that, on April 18, 1910, when examined, decedent "had quite marked hardening of the arteries;" that he was unable to recognize Dr. Plimpton, his family physician; that he said, in response

to a question, that he did not live in Glenwood; that he was suffering from senile dementia; that the disease is progressive, and that he (witness) "could not think he was capable of transacting business affairs at that time," and that in his opinion he was suffering from senile dementia October 1, 1909.

The several physicians reported to the court that:

"We believe that the physical condition of Mr. Ranne is such that to bring him into court would be absolutely prohibitive. As to taking his deposition at his home, we beg to state that Mr. Ranne is very deaf and nearly blind, and senile in all respects, and that, if taken at all, should be done very carefully, and in the presence of a physician, and even then we do not consider that it could be done entirely without danger."

Dr. DeWitt, who joined in this report, testified:

"He was an old man, about 90 years of age. Heart weak, arteries atheromatous. He was unable to walk and needed an attendant. His eyesight and hearing were greatly impaired, and it was with difficulty we were able to converse with him. He exhibited considerable interest in passing events, and when we succeeded in making him understand our questions, answered them all intelligently. I am unable to repeat any of the conversation, but have a distinct recollection that my impression was that his mental state was remarkably good, considering his age. I considered his mind sound at that time. He was sane. He impressed me of being capable of understanding himself and his surroundings. He gave evidence of thoroughly understanding his financial affairs as well as his local surroundings."

Dr. Plimpton's testimony was to the same effect. It also appeared that he had been decedent's physician since the spring of 1906, and he testified that decedent's afflictions then were indigestion and constipation, and that there

was no considerable change until December, 1911, when he discovered a kidney disturbance; that from then on decedent was afflicted with Bright's disease, and died from senility and uremic poisoning. In this physician's opinion, decedent was of sound mind up to 1912. Notwithstanding his testimony that decedent had suffered only from indigestion and constipation up to 1911, he had made affidavit, November 26, 1909:

"That he is about 90 years of age; that his heart is weak and the walls of the arteries are hard on account of his age; that it is necessary for him to lead a quiet and gentle life at his home and around his house, entirely free from excitement or the jar of quick physical action; that either quick physical action or any severe jar or any mental excitement would be liable to cause a breaking of the walls of the arteries and produce instant death; that on account of his age there is no hope of any improvement in these respects, but the great probability is that he will progressively grow worse as to that; that it will be dangerous to his life for him to leave his home and come into court or to engage in any other thing likely to cause any change from his quiet habits of life; that any mental excitement or disturbance of the even progress of his life is likely to precipitate the same consequences and cause his death; that it will be dangerous to his life to put him on the witness stand and put him through the process of examination and cross-examination, on account of the mental excitement that would thereby be occasioned, whether it is in the court room or in his own home; that it is indispensable to his life that he should be quiet and free from physical action, except the mild exercise in walking and other gentle methods of action around his house and home. As his family physician, I desire to enter my protest as solemnly as I can against his being attempted to be used as a witness in any form, and against

his going away from his home and immediately surrounding grounds."

This affidavit was but seven days after the signing of the second codicil, and is illuminating as to the physical and mental condition of decedent at the time. We are not inclined to join counsel in their respective criticisms of these physicians, even though the last mentioned may not have been entirely consistent. They were no more able to ascertain definitely the condition of decedent's mind than were his acquaintances of many years, save possibly for a better understanding of symptoms. The fault found with Drs. Scott and Cole, in that they did not include in the report to the court decedent's mental condition, is particularly unjust. These men were not to inquire into the condition of his mind, but whether his physical health was such that he might safely attend court or testify. To demonstrate his mental incapacity may have been the design of requiring his attendance. Dr. Barstow testified in answer to a hypothetical question, and, as some matters were improperly included, his testimony can be said to add little or nothing to the evidence adduced by contestant. On the other hand, the attorney preparing the will and codicils, one of those who witnessed the execution of the will, one of those witnessing the first codicil, and both of those witnessing the second codicil, a banker, a stepdaughter, a friend of the latter's who had frequently visited the family from 1905 on, and several other non-experts, as well as the two physicians mentioned, expressed the opinion that he was of sound mind. We have set out or referred to this much of the evidence found in the large record before us, not for the purpose of determining whether decedent was of unsound mind when he signed the will and codicils, but to demonstrate that there was ample evidence to carry that issue to the jury.

Counsel for proponents direct attention to several matters said to militate against the justice of this conclusion. The decedent was nearly 88 years of age when the alleged will was signed, and over 90 when the codicils were prepared. As argued, the circle of love and influence is likely to narrow as the years beyond the allotted time increase. As life becomes more solitary and exposed to neglect, the control of property is the most efficient and often the only means of compelling the attention due, and whatever the aged may do with reference thereto, when acting rationally, should be accorded the considerate protection of the courts. On the other hand, their situation is such as peculiarly to expose them to imposition and fraud, and courts also should be vigilant in shielding them and their property against the designing wiles and selfish encroachments of those closely associated with them. All exacted is that whatever they do shall be of their own volition and the product of a sound mind. No doubt a testator may and should dispose of his property as he chooses, but when in doing so he prefers the children of another, even though indirectly, to his own, this is so contrary to the ordinary course that a suspicion arises that something is wrong. Counsel may have persuaded themselves that willing the larger part of his property to the second wife, who was then 65 years of age and had not participated in accumulating it, was the natural thing to do, but jurors are likely to speculate as to whether, in so giving, the testator was rational; for if so he must have taken into consideration whether she would need and be likely to make use of more than the income, and whether the bequest of the property was not really through her to her children. If he did not so realize and yet made the will, the circumstance had some bearing on the issue being tried. Again, counsel talk about 17 years of faithful service by this wife; is there anything

*margin note:* 4. WILLS: testamentary capacity: evidence: ignoring children: strangers as beneficiaries.

to.detract from the performance of the marital obligations due from a husband? If she looked after him, he cared for and supported her. Neither accumulated property. Neither relied on his own nor the children of the other for care or support, though her daughter resided with them, and after a year or two received interest on the certificates of deposit at the banks. So far as the record discloses, as between this husband and wife it was a case of *quid pro quo*. Would not a rational man have taken into account the probable brevity of the life of a woman of 65 .years, and that all given her would go to her children and not to his own flesh and blood? It may be that he had helped his own children in the past. Certainly he had relied on contestant to assist him in caring for and renting his land up to the time of his marriage, and, as certainly, he dispensed with his services thereafter, and, for some reason undisclosed by the record, all connection with his own children was severed. Even if he had given to his children, that might not be regarded as justification for denying them the bulk of what remained, as against others having no claims on his bounty. The process through which a man advanced in years passes, after taking unto himself a spouse other than the mother of his children, in forgetting his obligations to those bound to him by the ties of blood, and who have helped to accumulate a fortune, and in bestowing his fortune in large part or wholly on strangers in blood who have been more of a burden than benefit, is past finding out, and jurors are unlikely to be found who will, in passing on the issue of mental unsoundness, entirely close their eyes to such a situation.

We agree with counsel for appellants 5. WILLS: testa- that advanced or even extreme old age is mentary ca- pacity : old age. not, alone, evidence of mental incapacity, and quote with approval from their brief the excerpt from Sherwood's famous address, delivered on the eightieth birthday of Speaker Cannon:

"It is a mistake to suppose that a man who has reached the age of 80 years has reached the acme of his intellectual development. Pope Leo XIII and John Adams were in the full possession of their intellectual powers at 90. John Wesley was at the height of his eloquence and at his best at 88. Michael Angelo painted, at 80, the greatest single picture that was ever painted since the world began. He made the sky and sunshine glorious with his brush at 83. General von Moltke was still wearing the uniform at 88, and at 70 he commanded the victorious German army that entered the gates of Paris. George Bancroft was writing deathless history after 80. Thomas Jefferson, Herbert Spencer, Talleyrand and Voltaire were giving out great ideas at 80. Tennyson wrote his greatest poem, "Crossing the Bar," at 83. Gladstone made his greatest campaign at 80, and was the master of Great Britain at 83. Humboldt, the naturalist, scientist,—the greatest that Germany ever produced,—issued his immortal Kosmos at 90."

As glorious as are the careers of the aged great of the world, they are exceptional in the matter of unusual achievement after having passed the allotted period of human life. The Scriptures bear witness that:

"The days of our years are three score years and ten; and if by reason of strength they be fourscore years, yet is their strength labour and sorrow; for it is soon cut off, and we fly away."

The ravages of disease play havoc with mankind, and impair mentally and physically at all ages. Age is not a test of mentality, though, everything else being equal, mental incapacity is more likely as the years go by. As contended, the rights of old age should be tenderly guarded, but this will be quite as effectually done by striking spurious instruments not evidencing the voluntary or intelligent act of the purported signer as by establishing and giving effect to those emanating from unhampered volition and unim-

paired intelligence. We have said this much in response
to the appellants' discussion of what probably brought about
the verdict. The charge of mental incapacity in such a
case opens up a wide field of inquiry, and the situation and
relationship of the parties is not only appropriate but is
bound to be taken into consideration by the jury. We are
of opinion that the evidence was such as to leave it open for
the jury to find the issue as to decedent's mental condition
either way, as the truth appeared to them to be.

V. A hypothetical question which had
been reduced to writing, covering 16 printed
pages, was submitted to Dr. Barstow, and
he was asked his opinion as to the mental
condition of decedent, and what it was in
the month of October, 1906. Counsel for defendant were
given an opportunity to examine this question, and they
interposed general objections thereto, in substance saying
that facts proved had not been fairly stated, and others
omitted, and that those repeated were stated in a one-sided
and biased manner. There was no objection to any specific
statement contained in the question. Objections were over-
ruled, and it is now contended that this was error, for that
it was recited that, in June, 1903, when examined by two
physicians (Corbin and Rush), decedent "at that time had
senile dementia," and that, during the winter of 1904 and
1905, he was "suffering from senile dementia;" whereas
there was no evidence thereof.

*6. EVIDENCE: opinion evidence: hypothetical questions: form and accuracy.*

Hypothetical questions usually include several and
sometimes a great number of facts, and it would be unfair
to exact of the trial court an absolutely accurate compari-
son between those recited and the proof adduced. That is a
matter to be attended by counsel. Certainly it is not too
much to require that the party objecting shall know the
ground on which he bases the objection, and enlighten the
court concerning the particular defect in the question.

*State v. Ginger,* 80 Iowa 574; *Allison v. Parkinson,* 108 Iowa 154; *Seckerson v. Sinclair,* (N. D.) 140 N. W. 239; *Prosser v. Montana Cent. R. Co.,* 17 Mont. 372 (30 L. R. A. 814); *Rivard v. Rivard,* 109 Mich. 98 (63 Am. St. 566); *Howland v. Oakland C. St. R. Co.,* 110 Cal. 513 (42 Pac. 983). Ordinarily, as was said in *Meeker v. Meeker,* 74 Iowa 352, opposing counsel will not be slow, in re-examination of the witness, to correct the hypothesis upon which the question is based, if it be inaccurate, and, as said in *Hall v. Rankin,* 87 Iowa 261:

"Hypothetical questions need not be framed with technical accuracy; that an error as to one or more facts is not prejudicial, as the opposing party may, on cross-examination, show the error, if any there be."

The items referred to could readily have been eliminated by a question from counsel for proponents, and, as the court's attention was not directed thereto by specific objection nor in the cross-examination, we are of opinion that they are not in a situation to complain.

As we discover no error, the judgment of the district court is—*Affirmed.*

GAYNOR, C. J., EVANS and SALINGER, JJ., concur.