THOMAS D. COOKMAN et al., Appellants, v. HARLEY BATEMAN et al., Appellees.

No. 40340.

JUNE 23, 1930.

*E. G. Dunn, Lowell L. Forbes,* and *E. J. Hook,* for appellants.

*Nelson & Lynch* and *Donnelly & Lynch,* for appellees.

ALBERT, J.—Lucy Wingate died January 15, 1929, leaving a will, dated October 20, 1926, which is the subject of this controversy. The will was duly probated on February 18, 1929, and on May 1st following, a petition at law was filed herein, asking that the probate of said will be set aside, and the will held for

naught. The petition contained the usual allegations of undue influence and mental incapacity.

The question is whether there is sufficient evidence to take the case to the jury as to the mental unsoundness of Lucy Wingate at the time of the making of the will, or whether said instrument was procured by undue influence.

Lucy Wingate died without leaving lineal descendants, and, at the time, was the owner of an undivided one-half interest in a quarter section of land, and an undivided one-fourth interest in 50 acres, all in Winneshiek County, Iowa, and personal property of the value of about $8,000, subject to an estimated indebtedness of $2,130.

In the absence of a will, her estate would descend collaterally to two brothers, a sister, eight nephews, sixteen nieces, and one grandniece, all of whom were remembered in the will. It is to be remembered that, this will having been probated, the burden of proof is upon the plaintiffs, appellants, to establish the material allegations of their petition before they are entitled to have the case go to the jury.

We take up first the question of mental incapacity. The law governing this question has been so long established in this state that we need make but slight reference to the authorities.  It is well settled in this state that physical weakness or infirmity, if proven, is not in itself sufficient to avoid the probate of a will, and mere mental weakness, not due to mental disease, until it has reached that stage which deprives the testator of capacity for intelligent action, does not constitute mental unsoundness such as to incapacitate him from making a will. See *Byrne v. Byrne*, 186 Iowa 345; *Sutherland State Bank v. Furgason*, 192 Iowa 1295; *Nason v. Chicago, R. I. & P. R. Co.*, 149 Iowa 608; *Speer v. Speer*, 146 Iowa 6; *In re Will of Shields*, 208 Iowa 607.

As to mental incapacity, the rule has been well settled in this state that one who has a full and intelligent knowledge of the act in which he is engaged, a full knowledge of the property he possesses, and an intelligent perception and understanding of the disposition which he desires to make of it, of the persons whom he desires to be the recipients of his bounty, and of the natural objects of his bounty, even though he has not sufficient

mental capacity to make a contract or to attend to ordinary business matters, has sufficient capacity, in the eyes of the law, to make a will. *Seamans v. Gallup,* 195 Iowa 540; *In re Estate of Law,* 158 Iowa 609; *Meeker v. Meeker,* 74 Iowa 352; *Webber v. Sullivan,* 58 Iowa 260; *In re Will of Convey,* 52 Iowa 197.

Under the rules laid down in this line of cases, we turn to the record to see whether or not the plaintiffs have carried their burden on this question. There is no direct testimony on this question. Plaintiffs offered no witness, either expert or non-expert, who testified directly on the question of mental unsoundness.

At the time of her death, deceased was about 80 years of age. Her early home was in Montreal, Canada,. and, about 50 years prior to the time of the trial of this case, she and her husband settled in Winneshiek County. She had a fair education in her girlhood. More than 40 years ago, she was stricken with an illness which confined her to her home for about 14 years. As a result of a physical ailment, it was difficult for her to move around, and she usually walked with a cane, and during the latter years of her life, she needed assistance in getting around. She frequently had crying spells, and sometimes suffered from dizziness. The presence of strangers and sometimes the arrival of close friends or relatives caused a physical depression, and she would retire to her room. After the death of her husband, her son transacted business for her, and after his death, her affairs were looked after by other members of the family, mostly by Julia Wingate Lindsay, a niece, who lived with her after the death of her son, and later took the deceased to her home at Superior, Wisconsin, where she remained for some time. Mrs. Wingate afterwards made her home with one Ed Darrington and wife, at Mabel, Minnesota. She made frequent visits back to the old farm home. She had, of course, no business experience, but, from the evidence, she appears to have known what was being done about her affairs, and was frequently consulted as to what should be done, both by the tenant on her farm and by those who were looking after her business. It is true that she displayed little interest in her farm property or operations, leaving them entirely in the hands of others. She was of frail physique, and her physician says she was a neurasthenic in later years.

One witness testified that on occasions she saw her swoon or

faint away. She did little around the household in later years except to wipe dishes. She did not write many letters in her later years, but communications made by her with distant relatives or friends were written by some member of the family. Much testimony is introduced as to her physical condition and her conduct subsequent to October 20, 1926, the date of the will. Her voice was weak, and she talked very low, and ate very little. However, in spite of all of these physical disabilities, the evidence shows that on some occasions she visited friends and relatives, and made several trips to California, one in an automobile, with her son, Albert. From the last of these trips she returned in 1926. She did not read papers or periodicals, but others read them to her. Because of her physical condition, looking after the farm, buying groceries and supplies, and trading in the stores and shops were carried on by other members of the family.

One witness testifies that he grew up on a farm near the Wingate home; that he saw or remembered times in 1926, prior and subsequent to the death of Mrs. Wingate's son, Albert. He says she walked very little, did not go out of the house; that her voice was not strong. She was very weak, and did not talk much. In the later years of her life, particularly in 1926, she was much weaker than in earlier years. During the years he knew her, she always had some kind of spells. When relatives came to visit her unexpectedly, she would become unconscious, her circulation seemed to stop, her neck would swell up, and the veins in her neck would become very prominent. She had these spells for several years.

The spells about which this witness testified, caused by the sudden arrival of relatives or friends, were during a 14-year period about 30 years previous to the time of the trial.

Another witness testified that he lived about half a mile from the Wingate home. During the summer of 1926, Mrs. Wingate was usually up and around, but did not walk about the place. She was frail and weak, and in 1927 and 1928, she failed quite rapidly.

Such is the general course of the testimony on this proposition. We cannot set out the evidence in full, but it necessarily follows from what we have stated that testimony necessary to sustain a charge of mental incapacity is wholly lacking. None of the requirements under the well known rules of this court

have been met which would warrant us in saying that the plaintiffs have made a prima-facie case on the question of mental incapacity.

As to the question of undue influence, the rules governing this question are equally well settled. Undue influence, in order to vitiate the testamentary disposition of property, must be such  that the party accused of undue influence must have substituted his mind or wish for that of the testator. In other words, it must be equivalent to moral coercion. See *In re Will of Richardson*, 199 Iowa 1320; *In re Will of Busick*, 191 Iowa 524, and Iowa cases there cited.

We have said that importunity, requests, and persuasion that do not go to the point of controlling the testator are not enough. *In re Estate of Mott*, 200 Iowa 948; *Wolfe v. Shroyer*, 206 Iowa 1021; *Wackman v. Wiegold*, 202 Iowa 1391; *Worth v. Pierson*, 208 Iowa 353, and Iowa cases therein cited.

It is also a settled rule in this state that opportunity to employ undue influence and disposition or state of mind to employ such undue influence are not, of themselves, sufficient to prove the ultimate fact. *In re Will of Richardson*, 199 Iowa 1320, and cases there cited; *In re Will of Eveleth*, 177 Iowa 716; *Zinkula v. Zinkula*, 171 Iowa 287.

As to this question the evidence is very meager. The charge is that Julia Wingate Lindsay, by reason of her undue influence, procured the making of this will, in which she is the larger beneficiary. She came to live with the deceased after the death of Mrs. Wingate's son, Albert, and seems to have had the larger share in caring for the deceased. Necessarily she was with her very much of the time, by reason of her duties in caring for her, and of necessity would answer her letters, write checks, and aid her in many other business ways. The will was drawn by a totally disinterested party, and Julia Wingate Lindsay was not present in the room during the preparation or execution of the will. There is nothing in the record showing that she solicited or importuned the deceased to make a will in her behalf, and there is, in fact, nothing by way of testimony from which even an inference could be drawn that Julia Lindsay attempted to or had any influence or power over the deceased in the making of this will. No witness testifies to anything that would indicate

508

that she had anything to say or do with the contents of this will. The lone fact that she was the larger beneficiary under the will would not, in itself, indicate anything of this kind. In the light of the fact that Mrs. Wingate left no lineal descendants, and that her husband predeceased her, and that her property must all go collaterally, the fact that she may have given this niece who cared for her in hours of distress and old age a larger share than any of the other beneficiaries, does not prove undue influence. We cannot set out the record, but must say, after a careful reading of the same, that we find no elements necessary to the setting aside of the will on the grounds of undue influence.

It is true that the deceased's physical weakness and mental weakness, if any, were circumstances that could be taken into consideration in determining the question of undue influence, yet their force cannot supply the necessary elements on which to base an action of this kind. The action of the district court in sustaining the motion to direct a verdict in favor of the defendants was right.—*Affirmed.*

MORLING, C. J., and STEVENS, FAVILLE, and WAGNER, JJ., concur.