IN RE ESTATE OF; LEO HELLER.

FRANK HELLER, Appellant; LORETTA OHNEMUS et al., contestants not appealing, v. GERALD JOHN RIPPERGER, Appellee.

No. 46365.

NOVEMBER 16, 1943.

Howard L. Bump, of Des Moines, S. E. Prall and J. O. Watson, both of Indianola, for appellant.

O. M. Slaymaker, R. E. Killmar, D. D. Slaymaker, all of Osceola, and J. B. Wilson, of Indianola, for appellee.

BLISS, J.—The last will of Leo Heller, deceased, was executed on May 19, 1941. He died at the age of about fifty-seven years, on August 31, 1942, in Warren County, Iowa, where he had resided for many years, leaving neither widow nor child, but the contestants, Frank Heller, brother, Loretta Ohnemus, Edward Heller, and Cecil Heller, the children of a deceased brother, August, as his next of kin and sole heirs. By his will, he gave all of his property, subject to the payment of his debts, sickness and burial expense, and costs of administration, to Gerald John Ripperger, named as executor in the will, and Vitus Charles Ripperger, to be shared equally by them. These beneficiaries were brothers and not related by blood or marriage to the testator, but they had worked as laborers on his farm for several years. In the will the testator stated: .

"* * * that I am giving said property to the said devisees and legatees for the reason that I have no children of my own and both have worked for me for some time and both have been very kind to me."

Upon the filing of a petition for the probate of the will by the appellee, the contestants filed objections thereto. These objections, though variously stated, are: (1) the testator lacked testamentary capacity (2) the execution of the will was induced by the undue influence of the beneficiaries, and (3) the will was not properly executed.

On motion of the appellee, at the close of all of the testimony, the court withdrew from the consideration of the jury, objections 2 and 3 above noted. In sustaining appellee's motion to direct a verdict, the court said:

"* * * the Court is of the opinion there is not sufficient evidence in this record which would warrant submitting to you as jurors the question of whether or not Heller was competent at the time the Will was executed. Under the record there must be evidence to warrant reasonable persons to say that, at the time in question, Mr. Heller was mentally incompetent, and did not know the amount of his property, and did not realize those who were the natural objects of his bounty. * * * the Court is of the opinion the only thing in the record is, Mr. Heller was an excessive user of intoxicating liquors. The record does not show that at the time the Will was executed, or within any close proximate time to the time of the execution of the Will that Mr. Heller was intoxicated. Most of this evidence goes from the year 1934 down to and including 1940—a few scattered instances in 1941. For that reason, the Court is withdrawing from your consideration, and will ask this gentleman to sign this verdict under the direction of the Court."

While the contestants, as one objection to the probate of the will, alleged that the testator was intoxicated at the time of its execution, there was no evidence even tending to support the allegation, and the real theory of appellant's case is, not that the testator was intoxicated when he executed the will but that years of excessive drinking of alcoholic liquors had so weakened and impaired his mind that he lacked mental capacity to make a testamentary disposition of his property on May 19, 1941, when the will was executed. The real question for determination is whether that issue should have been submitted to the jury.

Appellant assigns four errors, to wit: (1) in refusing to permit Mrs. August Heller to give her opinion that testator was of unsound mind when he made the will (2) in refusing to permit Mary Wachter to give such an opinion (3) in directing a verdict upon the ground that there was insufficient evidence of mental unsoundness when the will was executed, and (4) in withdrawing the issue of undue influence.

Some additional facts which bear upon the assigned errors should be stated. The parents of the testator had six sons, named, in the order of seniority, Frank (contestant), August, John, Fred, Joe, and Leo. The last four were wifeless and childless. The father died in 1912 and the mother died in October 1934.

The unmarried boys all remained on the home farm until they died. Fred died about 1924, and Joe died on May 15, 1941, just four days before the will in controversy was executed. Mary Wachter began working in the home in September 1934, while the mother was living and remained after her death until about March 1935. She came back as housekeeper about December 1, 1935, and remained until the middle of June 1938. The appellee was working on the farm and living in a tenant house when she came, and remained thereafter. His brother Vitus began work in 1936 and lived in the main house. She testified that Leo slept on a cot in the dining room after his mother died, and that he drank whisky, alcohol, wine, and beer and was intoxicated every day while she worked there; that he would go for days without undressing, sleeping with his clothes on; that he was unclean in his habits, went about the house at times indecently undressed; was abusive in language, and at times threatened the lives of those in the house. She saw him occasionally after she left during the remainder of 1938, once or twice in 1940, and two or three times in 1941—one of these times being at Joe's funeral and the other time about July 4th. She saw him once at Abbott's Hospital at Oskaloosa or in Ottumwa about July 5, 1942. She testified that Leo came to her home sometime late in 1938 when he was drunk, but she gave no testimony as to his drinking in 1939, 1940, 1941, or 1942.

The appellant, Frank Heller, gave no testimony which aided the contestants in any way. The contestant, Edward Heller, testified that he was at his grandmother's place in 1933 and 1934, both before and after her death, and that Leo Heller was drinking lots of times when he was there. The other two contestants did not testify.

Mrs. August Heller, whose husband died January 1, 1938, and whose children are contesting, testified that she and her husband lived but a few miles from the home place, and that before the mother died she often was there to help her and for social visits. Before the mother died she would see Leo three or four or more times a week, but after that she did not go there so much. She testified that she had seen liquor in the house and had seen Leo "when he was very much under the influence of it. On Easter Day in April, 1939, I saw Leo Heller laying there

looking like a very sick man on the cot. Doctor Taylor was called and we took Leo to Hill's Retreat, a hospital in Des Moines.'' He was at the hospital about a month. The treatment he received or the nature of the hospital is not disclosed in the record. About a year before Joe's death, Leo apparently had been drinking and was taken out of the church because of the disturbance he was making. The witness heard him but did not see him on this occasion. In March 1940 he was in Abbott's Hospital in Oskaloosa, where she saw him after he had been there about two weeks, and saw him a second time before he left the hospital. She testified: ''We just visited as anybody would. I asked him how he was and he told me several things that I thought was a little queer. * * * one thing he told me. I ask him if he had been out of the hospital, and he said yes * * *. He, also, told me about different ones being to see him that I wondered about.'' There is nothing in the record to indicate that what he told her was not the truth. With the exception of the church incident and the two times the witness saw Leo in the Oskaloosa hospital she said she never saw him very much at any other time. There is no evidence that she saw him intoxicated, or even saw him, within months of the time the will was made.

Dr. Abbott, a physician and surgeon, seventy-four years old, operated a hospital of some kind at Oskaloosa. He treated mental cases, most of which were afflicted with alcoholism. He testified that Heller entered the hospital on March 8, 1940; he had a pain and stiffness in his right shoulder for six weeks; his lungs were congested; he had an awful cough since Christmas; he had a temperature of ninety-nine, which reached one hundred the next day; he had a very high pulse of 112; he had the flu and was threatened with pneumonia and was put in a pneumonia jacket; he had an infection of his gall bladder, infection of his teeth and frontal sinuses; he had a streptococcic infection; he had five thousand units of intestinal flu affecting his bronchial tubes and lungs; he was very feeble; he had been drinking heavily; he was very delirious and became more so for two or three days and talked a great deal and did not know where he was; high temperature might cause delirium. He was given alcohol for two days and none thereafter. He was given the

liquor cure and gradually improved and was up and around the hospital. He shaved himself on March 26th, and left the hospital April 15th and paid his bill. At this time the doctor said he was not completely cured. Over objection the doctor diagnosed his condition as alcoholic delirium when he entered the hospital. The witness was asked whether Heller was sound of mind or unsound. Over objection that the question was inadmissible because it referred to a time too far removed from the execution of the will, the witness answered:

"Judging from the things he did and said, I would say he was unsound of mind."

Over a like objection to an inquiry as to whether Heller had sufficient mental capacity to comprehend what property he had, the witness answered:

"No. His mental capacity was very limited *when he came in*. He had a feeling, or delusion, that there was—his folks was trying to take it away from him. That is the reason he referred to it so much. I don't think he had the capacity. When he first came in, he seemed to be in a delirium; didn't know anything."

The witness also testified that if Heller began drinking again after leaving his hospital: "As soon as his system became saturated with alcohol *he would have all those symptoms again. He would become delirious again.*" He testified that his mind was much improved when he left the hospital.

Another witness testified that he had known Heller for around twenty years, and had business transactions with him, and together they had bought the assets—notes, mortgages and overdrafts—of the closed Citizens Bank of Milo in the late fall of 1938, and were engaged in collecting them for about two years. They went out collecting one or two days a week and almost every day they went out Heller was intoxicated and some days they would return for that reason. Another witness observed Heller around the town of Milo during the spring of 1941, and several times he was intoxicated. The mayor of Milo testified that he saw Heller occasionally in town, mostly on the street, "around May of 1941," and that he was under the influence of intoxicating liquor practically every time he saw him, and he had

1362

seen him in that condition for a number of years. There is no evidence as to his relations with the contestants, or of their financial worth, or of their claims upon his bounty other than their blood relationship. Neither was there any evidence of the value of the testator's estate.

The foregoing is a full and fair statement of the testimony bearing upon the testator's drinking and mental condition.

I. There is no merit to the first assignment of error. Mrs. August Heller was asked this question by appellant: "Now Mrs. Heller, basing your opinion on what you have detailed here to the jury what would you say as to whether Leo Heller was sane or insane about the time of Joe Heller's death"? (Joe Heller died four days before the testator's will was executed.) The appellee objected upon the grounds of the incompetency, irrelevancy, and immateriality of the testimony, and that the witness had not detailed anything in her testimony that would justify her in giving an opinion in regard to the testator's insanity at the time inquired about. The objection was rightly sustained. There was no offer of proof as to what her answer would have been. Her answer would not have aided appellant unless she would have given an opinion that the testator was insane. In not offering to show that such would have been her answer, the appellant failed to lay a foundation for the assignment of error. Arnold v. Livingstone, 155 Iowa 601, 606, 134 N. W. 101, 103; Kuhn v. Gustafson, 73 Iowa 633, 637, 35 N. W. 660; Antes v. Consumers Consolidated Coal Co., 203 Iowa 485, 490, 210 N. W. 767; Pearson v. Butts, 224 Iowa 376, 387, 276 N. W. 65; Mitchell v. Automobile Underwriters, 225 Iowa 906, 914, 281 N. W. 832; In re Estate of Wagner, 226 Iowa 667, 675, 676, 284 N. W. 485; Campfield v. Rutt, 211 Iowa 1077, 1080, 235 N. W. 59.

Mrs. Heller was not an expert in the subject matter inquired about. To entitle her to give an opinion against the mental competency of the testator she must first have testified to facts reasonably tending to support such an opinion, so that the jury might advisedly pass upon the basis of the opinion. This has always been the holding of this court. State v. Stickley, 41 Iowa 232, 236, 237; Alvord v. Alvord, 109 Iowa 113, 115, 80 N. W. 306; Stutsman v. Sharpless, 125 Iowa 335, 340, 101 Iowa 105;

Ranne v. Hodges, 181 Iowa 162, 167, 168, 162 N. W. 803; Erwin v. Fillenwarth, 160 Iowa 210, 216, 217, 137 N. W. 502; Bales v. Bales, 164 Iowa 257, 265, 145 N. W. 673; In re Will of Diver, 214 Iowa 497, 503, 504, 240 N. W. 622; Campfield v. Rutt, supra, 211 Iowa 1077, 1080, 235 N. W. 59. As noted in our statement of her testimony, she testified to no facts which gave support to an opinion that the testator was insane. Since the opinion of a nonexpert is no stronger than the facts on which it is based there can be no prejudice in excluding an opinion based on facts which do not support it. Fothergill v. Fothergill, 129 Iowa 93, 97, 105 N. W. 377; Bailey v. Cherokee State Bank, 208 Iowa 1265, 1270, 227 N. W. 129; In re Estate of Paczoch, 202 Iowa 849, 852, 211 N. W. 500.

Furthermore, the question called for an opinion respecting the insanity of the testator at a time when she had given no testimony concerning any observations of or conversations with the testator. The general rule is that a nonexpert witness must confine his opinion as to insanity to the time of his observation of the person inquired about. State v. McGruder, 125 Iowa 741, 748, 101 N. W. 646; Blake v. Rourke, 74 Iowa 519, 523, 38 N. W. 392; Speer v. Speer, 146 Iowa 6, 16, 123 N. W. 176, 27 L. R. A., N. S., 294, 140 Am. St. Rep. 268; In re Will of Kester, 183 Iowa 1336, 1346, 1347, 167 N. W. 614; McBride v. McBride, 142 Iowa 169, 174, 120 N. W. 709; Dolan v. Henry, 189 Iowa 104, 121, 177 N. W. 712.

II. Mary Wachter was asked this question by the appellant: "Now basing your opinion on what you have detailed here to the jury, would you say that Leo Heller, along about the latter part of the time you were there was of sound or unsound mind"? (She left the Leo Heller home in the middle of June 1938.) Objection was made by the appellee to the relevancy, competency, and materiality of the testimony, in that there was no sufficient fact basis detailed by the witness to support an opinion as to mental unsoundness, and because the inquiry was respecting a time too remote from the time of the execution of the will. The objection was rightly sustained. The appellant offered to prove that the witness would have testified that Heller was of unsound mind at the time inquired about. An objection to the proffer was sustained and no exception was taken to the ruling. What

1364

we have said in Division I respecting the insufficiency of the matters detailed by Mrs. Heller in her testimony to support an opinion of mental unsoundness applies also to the testimony of Mary Wachter. What she testified to respecting Heller had to do with his conduct when drunk, or under the influence of intoxicants, at times from three to six or more years before the will was executed, and had little, if any, relation to his testamentary capacity on the latter date.

III. The only other testimony offered or admitted which bears, with any weight, upon the issue of testamentary incapacity is that of Dr. Abbott. The opinions which he gave that the testator was of unsound mind and that he had not sufficient mentality to comprehend his property, when fairly appraised, applied to the time when he came to his hospital. His answers clearly indicate this. Heller at that time was a very sick man, not only from excessive drinking but because his body was poisoned with infections. He was not cured of the liquor habit when he left, but he was much improved mentally and bodily, according to the witness. The doctor urged him to stay longer so that he could completely cure him. His testimony clearly indicates that the mental impairment from which the patient was suffering, because of alcoholic excesses, was not a fixed condition, or one growing progressively worse after its inception, like senile dementia, but was a condition the improvement or aggravation of which would depend upon whether he would or would not drink to excess in the future. If he continued to saturate his system with alcohol, according to the witness, he would have all those symptoms which he had when he came to the hospital, "he would become delirious again." It is true that Heller was seen in an intoxicated condition on the street thereafter, and "around May, 1941," but there is no witness who testified that he was ever seen in the condition that he was in on entering Abbott's Hospital. No witness testifies that he was of unsound mind on or about May 1941. On days when he was not drinking he was capable of going, and did go out, driving his own car, and transacting business in collecting assets purchased of the defunct bank. Doctor Abbott testified that Heller lacked mental capacity to comprehend what property

he had. But he testifies to no tangible information or data on which he based the opinion. That was his condition when he entered the hospital, on the verge of alcoholic tremens, and a delirious fever, when "he didn't know anything." He does not say that was his condition on April 15th, when he paid his bill, and left with "his mind much improved." Neither did he, in his testimony, give much, if any, information of the effect of the excessive drinking of intoxicating liquors, with respect to lasting injury to the brain cells or permanent impairment of the mental faculties, if any.

We have so many times discussed the requisites of testamentary capacity that further comment would serve no purpose. The right of an individual to dispose of his property as he sees fit, even though he make what others might think was an unequal or unjust disposition or give nothing to some or all of those who are regarded as naturally entitled to his bounty, is nevertheless a sacred right with which the courts must not interfere when it appears that he knew what he was doing. There is no such thing as a legal right in any relative, other than the surviving spouse of a testator, to the latter's bounty. Standing alone, the deprivation of that bounty cannot destroy a will. Testamentary capacity does not require entire soundness of mind. Burgess v. Pollock, 53 Iowa 273, 275, 5 N. W. 179, 36 Am.. Rep. 218; Jones v. Schaffner, 193 Iowa 1262, 1275, 188 N. W. 787. In Perkins v. Perkins, 116 Iowa 253, 259, 90 N. W. 55, 57, we said:

"The right of a man to dispose of his property by will as he sees fit is one which the law is slow to deny. No mere weakening of his mental powers—no mere impairment of the faculties—will invalidate a will executed in due form, so long as he retains mind enough to know and comprehend in a general way the natural objects of his bounty, the nature and extent of his estate, and the distribution he wishes to make of it."

We have never departed from this rule. See In re Estate of Fitzgerald, 219 Iowa 988, 996, 259 N. W. 455; In re Will of Johnson, 201 Iowa 687, 689, 207 N. W. 748; Bishop v. Scharf, 214 Iowa 644, 653–655, 241 N. W. 3; In re Will of Richardson, 199 Iowa 1320, 1325, 1327, 202 N. W. 114; Bales v. Bales, supra,

164 Iowa 257, 261, 145 N. W. 673; Hanrahan v. O'Toole, 139 Iowa 229, 239, 117 N. W. 675; Byrne v. Byrne, 186 Iowa 345, 366, 172 N. W. 655; Gates v. Cole, 137 Iowa 613, 618, 115 N. W. 236; Cookman v. Bateman, 210 Iowa 503, 504, 231 N. W. 301; Seamans v. Gallup, 195 Iowa 540, 190 N. W. 395; Green v. Ellsworth, 221 Iowa 1098, 1101, 267 N. W. 714; In re Will of Diver, supra, 214 Iowa 497, 509, 240 N. W. 622; Walters v. Heaton, 223 Iowa 405, 409, 271 N. W. 310; In re Estate of Hayer, 230 Iowa 880, 883, 884, 299 N. W. 431; In re Estate of Johnson, 222 Iowa 787, 793, 269 N. W. 792; Campbell v. Hale, 233 Iowa 264, 6 N. W. 2d 128. There is not sufficient evidence in quantity or quality to raise a controversy with respect to any of the elements above stated. The testator had no direct relatives. His only surviving brother was seventy-one years old, and there is nothing in the record to indicate that he needed any aid from the testator's estate. The beneficiaries had been with him for six or seven years. They had been very kind to him, as he stated in his will. One or the other looked after him when he was drunk and brought him home. The burden was upon the contestants to establish the testamentary incapacity of the testator. The trial court who heard and observed the witnesses held that the contestants had failed to establish this issue. We fully agree with its decision, and hold that the third assignment of error is not sustained.

IV. Was there error in withdrawing from the case the issue of undue influence? It is our judgment there was none. There is no substantive evidence that either beneficiary under the will ever suggested to Heller that he make a will, or how he should make one, or exercised any influence, control, or domination over him in the execution of this will or the manner in which he thus disposed of his property. His remaining bachelor brother who lived with him in the old home had just died. This fact might very likely have suggested the making of the will. He personally interviewed those whom he wished for witnesses. He told them he had some business in Osceola and asked them to go with him. The witnesses and Heller went to Osceola with the Rippergers in the automobile of one of the latter. On the way to Osceola he told the witnesses that he was going to have his will drawn and wished them to witness it. On arriving at Osceola, Heller went alone to Attorney Slaymaker's office, and found that he was in

court. When Mr. Slaymaker returned to his office in two or three hours, Heller went in and the will was drawn. Heller then brought in the three witnesses. The will was read to or by the witnesses and Heller. He said it was as he wished it, and he signed it and it was duly witnessed and attested by the witnesses. There is no question about the due execution of the will and that issue was rightly withdrawn from the case. The beneficiaries were not in the office when the will was prepared or executed. That fact is not conclusive on the issue of undue influence. Brackey v. Brackey, 151 Iowa 99, 101, 130 N. W. 370; In re Will of Busick, 191 Iowa 524, 535, 182 N. W. 815. The burden of proving undue influence, and that it operated upon the mind of the testator at the very time the will was executed and to such an extent that the will was the result thereof and not the voluntary act of the testator, was upon the contestants. They have offered no direct or substantive evidence on the issue. Direct evidence is, of course, not essential. But the issue must not be left to conjecture. Facts must be proven tending to show undue influence, or from which reasonable inferences of its exercise may be drawn. The facts that the Rippergers lived with Heller and that they took him to Osceola on this occasion are not enough to establish this issue. We said in In re Will of Johnson, supra, 201 Iowa 687, 690, 207 N. W. 748, 750:

"Opportunity to exercise undue influence is not sufficient to carry the case to the jury. Zinkula v. Zinkula, 171 Iowa 287. Neither are opportunity and disposition, plus persuasion and importunity, sufficient to make a jury question. In re Estate of Mott, 200 Iowa 948."

We have so held a great many times. See Gates v. Cole, supra, 137 Iowa 613, 617, 115 N. W. 236; In re Estate of Townsend, 128 Iowa 621, 623, 105 N. W. 110; In re Will of Richardson, supra, 199 Iowa 1320, 1327, 202 N. W. 114; In re Estate of Lochmiller, 199 Iowa 358, 361, 202 N. W. 75; In re Will of Eveleth, 177 Iowa 716, 727, 157 N. W. 257; Cookman v. Bateman, supra, 210 Iowa 503, 504, 231 N. W. 301; Worth v. Pierson, 208 Iowa 353, 359, 223 N. W. 752; Arndt v. Lapel, 214 Iowa 594, 603, 243 N. W. 605; Fothergill v. Fothergill, supra, 129 Iowa 93, 98, 105 N. W. 377.

There was no evidence of sufficient probative value to take any issue raised by the objections to the will to the jury. The due execution of the will was clearly established. The testator was not intoxicated when the will was executed, nor is there any evidence that at that time he did not have an intelligent comprehension of what he was doing. The judgment is therefore—Affirmed.

All Justices concur.