ESTHER E. SQUIRES, Appellant, v. JOHN COOK et al.,
Appellees.

**APPEAL AND ERROR:** Abstract of Record—Amendment—Require-
ments. Counsel owes the duty to the court, in the preparation of
an amended abstract, to specifically point out the page and line of
the original abstract which he is correcting. (Rule 32.)

**WILLS:** Undue Influence—Fiduciary Relations—Evidence. Evidence
reviewed, and held to present a jury question whether the will was
the result of the undue influence of a devisee, who himself drew
the will at a time when no one was present but himself and de-
ceased, and who was then occupying a fiduciary relation towards
the aged deceased.

**WILLS:** Undue Influence—Fiduciary Relations—Burden of Proof.
A showing that a devisee himself drew the purported will at a time
when only he and the infirm and aged testatrix were present, coupled
with a further showing that said devisee then occupied an intimate
fiduciary relation towards testatrix, may be sufficient to raise a
presumption that the purported will was the result of the undue
influence of said devisee, with consequent burden on devisee to rebut
the unfavorable presumption.

**WILLS:** Undue Influence—Evidence—Connected Transactions. What
amount of property a devisee, charged with undue influence on his
infirm and aged mother, received out of his father's estate, may be
so connected with the making of the mother's will and the contest
thereon as to become decidedly material.

**WILLS:** Undue Influence—Evidence. On the question whether the
purported will of an infirm and aged testatrix was induced by the
undue influence of her son, evidence is admissible that the son and
his wife interfered with the visits of partially disinherited heirs
to their mother.

**WILLS:** Undue Influence—Evidence. On the question of the value
of the estate of a mother whose will was under contest, evidence of
the value of the personal property of her deceased husband may
become material, the mother having received a portion of the latter.

**WILLS:** Undue Influence—Evidence. On the question of undue in-
fluence, it may be shown that he who is charged with having exer-
cised such influence had been known to physically abuse testatrix.

*Appeal from Crawford District Court.—M. E. HUTCHISON,*
Judge.

FRIDAY, APRIL 7, 1916.

THE will of Elizabeth Cook, deceased, was admitted to probate on September 14, 1911. In August, 1912, plaintiff brought this action to set aside the probate, on the ground that the will was the result of undue influence on the part of defendant, John Cook, and because, at the time the will was made, deceased was not of sound, disposing mind and memory. There was no evidence introduced on behalf of the defense. At the conclusion of plaintiff's testimony, on motion of defendant, the court directed a verdict in favor of the defendant. The plaintiff appeals.—*Reversed* and *Remanded.*

*J. P. Conner,* for appellant.

*Andy Bell, Saunders & Stuart,* and *Sims & Kuehnle,* for appellees.

PRESTON, J.—1. Appellee has filed an additional abstract of about 20 pages, but we do not get much help from it, because the rules have not been complied with in a number of instances in the additional abstract, for that the page and line of the abstract where corrections are sought to be made are not given in the additional abstract. For instance, on page 4 of appellee's abstract, we find this:

1. APPEAL AND ERROR: abstract of record: amendment: requirements.

"Plaintiff's Testimony. Mary E. Nelson. Direct Examination. Upon reading of the deposition, the defendant made the following objection: 'The defendant objects to Interrogatories 20 to 32, inclusive, and the answers thereto, as incompetent, irrelevant and immaterial, and calling for hearsay testimony, and I want to include in these objections, also, Interrogatories 33, 34 and 35, and the answers thereto.' And upon the offer of Interrogatory 32, 'What did Mr. Cook

get out of the estate?' the defendants made the additional objection, 'This is the father's estate long years before,' and the objection was sustained.   (Tr. 61.)''

Again, on page 5, we find this:

''The objection to Interrogatories 67 and 68 was, 'I object to 67 and 68, and the answers thereto, as incompetent and immaterial,' and the following was added thereto (Tr. 68): 'This is for the years prior to the making of the will while she was living with her daughter.' ''

Again, at pages 7 and 8, corrections are made in the testimony of another witness, but the page of the abstract and the numbers of the lines are not given. As to some of the testimony set out in the original abstract, reference is made to the place in the abstract where the correction was sought to be made; but as to others, there is no reference at all. We could go through the abstract and probably find the language sought to be corrected. In some cases, this would be quite difficult and would take time. We think attorneys should do that, and the rules require it. If we had plenty of time, perhaps we ought not to object to the additional labor; but the fact is, we are not short on labor, though we are short of time.

2.   The principal question in the case is as to whether there was sufficient evidence in the record to go to the jury on the question of the alleged mental incapacity, or undue influence, or the two in combination. Under the rules, where there has been a directed verdict, the record should be construed more favorably to appellant.

2. WILLS: undue influence: fiduciary relations: evidence.

It will be necessary to refer to some of the more important facts. The husband of deceased died in November, 1890. Before his death he had made a will, at the making of which, we understand from the record, the defendant, John Cook, a son, was present. After her husband's death, Elizabeth Cook remained on the home farm until the following spring, when she went to live with her daughter, Mrs. Nelson, whose name at that time was Mrs. Coleman. Deceased remained on the

farm with her daughter for several years, when defendant, John Cook, came to the home of the daughter, Mrs. Coleman, and, as she claims, without notice, took the mother to his own home, where she lived until her death, on June 20, 1911. The old lady was 87 years of age at the time of her death. At the time she left Mrs. Coleman's and went to live with her son, deceased was about 75 or 76 years of age, and had not made a will. She did make a will in 1900, which is as follows:

"I Elizabeth Cook of the City of Denison, County of Crawford and State of Iowa, do make and declare this to be my last will and testament in manner and following to wit:

"First I give and bequeath to the Children of my Daughter Elizabeth Taplin One Thousand Dollers to be equelly devided among them.

"Second I give and bequeath to the children of my daughter Sarah Ann Bartlett One thousand dollers to be equelly devided among them

"Third I give and bequeath to my Daughter Mary E. Coleman One thousand dollers

"Fourth I give and bequeath to my daughter Ellen E. Cook (Nee) Ellen E. Donnelly twenty Seven hundred twenty five and 38-100 dollers by Cancelling all sums of indebtedness owed by such person to me March 4, 1896.

"Fifth I direct that all debts and funeral expenses be paid from money in possession of my son John Cook for such purposes.

"Sixth I give Demise and bequeath to my Son John Cook all property and money that there may be after Complying with paragraphs One, Two, Three, Four and Five of this document.

"Seventh whereas on account of age and infirmaties I am unable to manage my property I have for some time past turned the same over to my Son John Cook having full confidence that he will comply with this my last will and testament."

A few months after she was taken into her son's home,

the will was made, and following her death, was admitted to probate without contest. The evidence shows that, at the time the will was made, the value of the estate was about $6,000, and it also shows without dispute, and it is in fact conceded by defendant, that the will was prepared by him; that it was written by him in the room upstairs occupied by deceased, at a time when no one but himself and his mother was present.

As stated, the defendant was present at the making of his father's will, and received a large share of the estate. The sisters were very much dissatisfied with the share of the estate their father left them in his will: a contest was threatened, and the sisters came to Denison for the purpose of contesting their father's will. But their claim is that this was avoided by an agreement between the parties that the mother, Elizabeth Cook, should leave her estate to the two sisters, to be divided equally between the two, and that this agreement was made between the two sisters, the mother and the defendant John Cook, and that the consideration for the agreement on the part of the defendant was a promise on the part of the sisters that they would not contest the will of the father.

There is testimony, and not disputed, that, in the early part of July, 1900, a few days after the making of the will of deceased, Elizabeth Cook, the defendant called at his sister's place of residence in Kansas City; and defendant said to her that his mother was not well, and that she had made her will and left $3,000 to her, and he wanted to know if that would be satisfactory and if she would not attempt to break the will. The sister said in reply that it was not exactly as much as she expected, but she would not contest the will, and he said that he would see that she got it in cash. The plaintiff, a daughter, testifies that she heard her mother and Mrs. Coleman, now Mrs. Nelson, talking, on June 12, 1900, about the property; and in this conversation, the mother stated to Mrs. Coleman that it was her purpose to divide the property between the two girls. This was but a few days before the will was made, and before defendant went to Kansas City to

see his sister. After defendant, at Kansas City, had said to plaintiff that his mother had made a will and left her $3,000, Mrs. Squires, the plaintiff, testified that she heard a conversation between her sister Mary and her mother, in which her mother told her that she had done as she had agreed to do with the children; that she had left Mary and plaintiff the property; that, after caring for her at her death, what was left was to come to the girls, after all expenses were paid; and that she said she had made a will. No word was sent to Mrs. Squires, the plaintiff, of her mother's illness, and the first she knew was a telegram announcing her death. Plaintiff's husband testified that he heard deceased say to his wife that she had left her something over $3,000, and would have left her more, but her son objected. This was in December, 1900. A sister of plaintiff's testified that the home farm was sold shortly after deceased went to live with defendant; that defendant sold it; that he managed the business for his mother; that she had but the one brother; and that she thinks the farm was sold at $37 per acre; that defendant took the mother away from the home of witness about 1898 or 1899 and took her goods to Denison; that witness took the mother to the train for Denison; that she did not know before the day defendant came that the mother was going and had no conversation with him about taking her away; that deceased would have spells that would last two or three days, about every four or six weeks; was not raving or hard to control; and says further:

"When I was there, she was always in a frame of mind to visit; she always knew me; I don't know of any extraordinary care she had; so far as I know, my brother and his wife cared for her; there were several occasions he did use restraint in trying to compel her to be quiet; she would be restless. Probably he would say, 'Mother, you must not do that; you must be quiet.' There wasn't so much faultfinding with me as with my sister, Mrs. Squires. He didn't care to have her at his home. I have heard him say so; that he didn't

care to have her come. Defendant, during the last part of mother's life, denied plaintiff the right to come and see her; did not like to have her come. While mother was kept in the room upstairs, she could go about the house if able, and did as long as she was able; but the last two years, she was not able to move about much. I do not mean to say that mother was restrained of her liberty or kept there in the room upstairs against her will. Mother's health was apparently good when she went to Jackson County. She had spells that she did not know anybody for a day or two. I saw her once or twice. She had her spells, just as she always had them. She seemed to have pain. She did not know us; she did not recognize us for the time being while she was under the influence of the spells. They did not last long, not over a day or two. I took mother and left her at the home of my brother at different times. I was about 16 miles from them. In the fall of 1899, when I was going on a visit, I left her for a day or two with my brother. Mother's stroke of paralysis was in 1902."

Plaintiff testified that deceased, in a conversation with defendant, said that what was left when she died should be divided between Mrs. Coleman and plaintiff; that she heard her mother tell defendant that, "that is, if we didn't break the will of father's, he agreed to it." She says she saw her mother in June of 1900, and that the mother was not very well; that, when plaintiff went in to see her mother, the mother asked who she was and did not know her; that deceased seemed to be in a doze some way, did not seem to be bright; that witness cried because her mother did not recognize her. She says further:

"I heard mother say to Mrs. Coleman, now Mrs. Nelson, that her head hurt her so bad, that she had complained of the pain for two or three days."

She says that she heard a conversation between her mother and Mrs. Coleman in June, 1900, before the Kansas City trip, about the property; that "she said she intended to divide it amongst us two youngest girls."

She testifies that her husband was a railroad man and moved around different places a good deal, and that her mother said she had left plaintiff enough to buy a little home, and didn't want her to run around through the country so much. She says further:

"The next June, 1901, I was there, and mother and I were talking in her room and John overheard the conversation; and he afterwards told me downstairs to pay no attention to what mother said, for she was crazy, and had been for several years at times. He was always complaining about her mind, and he said that they had had so much trouble with her that they thought once that they would have to put her in the asylum. This continued at the different times I was there. Mother seemed to get mixed up as to what happened in late years; she didn't remember. I noticed this along about the time the will was made, or before, or soon after. She had these sick spells for several years, even when she was on the farm with Mary. Her mind wasn't clear for two or three days, it seemed, and then that spell would pass off and she could remember everything again. She acted queer at times."

Another witness testifies that defendant told him that he had been at Kansas City, and had told his sister that her mother had willed her $3,000. Defendant was executor of his mother's estate and filed a report, which had not been acted upon at the time of the trial of this case. It shows that he sold his mother's farm while she was alive and borrowed the proceeds, $5,000, from her, giving his note for it, and kept the note in his possession. The first item in this account is January 1, 1900, a few months before the will of deceased was made. The will, heretofore set out, states that, on account of age and infirmities, she is unable to manage her property, and that she has turned her property over to her son to manage. Appellant claims that the account shows a purpose on the part of defendant to absorb the mother's estate before she died.

They call attention to the charge of $1,378 per year for board, lodging and nursing. But the record shows that this claim had not been passed upon at the time of the trial of the will case. The report shows the collection and receipt of moneys by defendant, and that he paid out numerous small items for her, and some larger items too; but that, from 1900 to about the time of her death, he was receiving and paying out money and acting as her agent and managed her business for her.

The defendant, John Cook, was called as a witness for plaintiffs, the contestants, and testified, among other things, that his mother's land was sold in the spring of 1892; that he cannot say what it was sold for.

"My mother's will was deposited with the clerk of the courts; I brought it up and deposited it with the clerk shortly after it was made. At the time I drew this will, I had some money that belonged to mother, for the purpose of paying funeral expenses. I gave my mother my note after my father's death and before her death, and after the will was made, in 1900, mother turned this note over to me when she made the will. Mother turned the note over to me when the will was made, and the report dates back to January 1st, when we had our last settlement before she made the will. The report means that the note was on hand."

It should have been stated that the first item in the report before referred to, January 1, 1900, is amount of notes surrendered, $4,944.50, and it shows, on the same date, cash received from other sources, $471.01. Defendant, as a witness, continued:

"The statement means that the note was on hand. I have got it in my book on hand, and the statement that Mr. Simms' clerk made out that from was 'on hand,' not 'surrendered;' it was money that mother had in notes at that time when the settlement was made in 1900. The settlement made on January 1st was the settlement respecting her property, and this note was her property, and if not at that time in my possession, it soon after came into my possession, and I kept it

in my possession after the will was made. I suppose the statement in the will, 'Whereas, on account of age and infirmities, I am unable to manage my property, I have for some time past turned same over to my son, John Cook,' is a truthful statement for what it was meant. Q. Then for some time past you had had her property, had you not? A. Part of her property. Q. Why did you not qualify it when you phrased the will? (Objection sustained to this last question.) A. I drew this will. It means property that mother had in Vail that was being rented out. It was where she couldn't handle it, couldn't collect the rent off of it. I didn't have her property at that time. January 1st, I had other proceeds in my possession. Here is an item of $471.01. I can't remember things from memory. I prepared this will in mother's room at home. Nobody but myself and mother were there. It was in the morning of the 20th day of June; I can't remember what time in the morning. My mother had been at my home from November preceding the June the will was made.''

It is barely possible that, as to the question of mental capacity alone, a jury would not be justified in setting aside the will. But we have the situation here where defendant, a beneficiary under the will to the extent of probably $3,000, or more, drew the will when he and his mother alone were present, in defendant's own home, and at a time when there was a fiduciary relation existing between the deceased and the defendant. He had been managing her business and acting as her agent, and we think the circumstances were such as that a presumption arises against the defendant and that an explanation is required; and that, under the circumstances of this case, it would be a question for the jury as to whether any explanation which may be offered is sufficient.

3. WILLS: undue
influence:
fiduciary rela-
tions: burden
of proof.

Appellee cites cases to the familiar doctrine that advice or solicitation will not vitiate a will, unless it be shown that the freedom of will was impaired or destroyed thereby; that opportunity alone is not sufficient; and that the undue influ-

ence must be operative at the time the will is executed. But we have cases where it is not necessary that a person should be present, even. In this case, the defendant was present, and he alone, with his mother. Appellee cites *Hanrahan v. O'Toole*, 139 Iowa 229, where the chief beneficiary was the scrivener of the will. The holding was that, under the circumstances of that case, the presumption of undue influence did not obtain. The court, speaking through Mr. Justice Weaver, said:

"That there may be circumstances under which the proponent of a will must assume the burden of removing an unfavorable presumption of this kind may be admitted, but this is not shown to be a case of that nature. In the first place, there is no showing of such relation of confidence between the testator and Hanrahan as the rule cited by counsel contemplates. It is true that Hanrahan was the testator's son-in-law, but that fact alone is not sufficient to justify a presumption of confidential relations between them. There are some suggestions in the record indicating that Mr. O'Toole had considerable respect for the judgment and business ability of Hanrahan, but that he looked to him or relied upon him for guidance or was in any manner subject to his control or leadership is nowhere shown. There is no testimony that the father and son-in-law were then standing in the relation of principal and agent, or were so intimately associated in their business, social, or family affairs as to justify a presumption of undue advantage on part of the latter. The fact of family relationship or of the existence of the confidence and reliance which persons ordinarily repose in acquaintances and friends whose constancy and integrity they have tried will not justify a presumption of undue influence in the utter absence of any further showing that such trust has been abused."

And reference is there made to the *Butcher* case. But, as bearing upon the question of burden of proof where there is a confidential relation, see the late case of *Curtis v. Armagast*, 158 Iowa 507.

But, under the circumstances of this case, where the deceased was old and feeble and a confidential relation existed, we think the rule announced in *Ross v. Ross*, 140 Iowa 51, at 61, to the effect, briefly stated, that, if a person was aged and of impaired mind and memory, though he may not have been legally incompetent to make a will, yet the will of such a person ought not to be sustained unless such disposition of his property appears to have been fairly made, and to have emanated from a free will, without the interposition of others; and that, if the jury should find, under all the circumstances, that the disposition of the property did not emanate from a free will and was not in accord with testator's previous intentions, etc., the jury would be justified in finding that the will was not the voluntary act of the testator, but that it was obtained by undue influence. We have not attempted to give the exact language, but the substance only.

We shall not refer to the other case cited. From what has been said, it is manifest that there was sufficient in this record to take the case to the jury.

3. Quite a large number of errors are assigned on rulings of the trial court on the admission and exclusion of evidence. It was the claim of appellant that the defendant, John Cook, had received substantially all of his father's estate, some $17,000, but they were not permitted to prove this. Error has been assigned because the court refused to let the witness Nelson tell what property her brother, the defendant, got out of her father's estate, and what it was worth. It is true that the will of the father was not being contested in this case, but defendant was present also when the father's will was drawn, and the transaction is so connected with the estate of his mother and the execution of the mother's will, and the circumstances shown, that it would have a bearing and should have been admitted.

4. WILLS: undue influence: evidence: connected transactions.

Another assignment of error is that the court refused to permit Mrs. Nelson to testify that the defendant and wife

interfered with plaintiff's visiting her mother and seeing her.

We think the evidence was proper. The court

5. WILLS: undue influence: evidence.

also refused to permit Mrs. Nelson to state what she knew of her father's personal property at the time of his death.

We think it was proper to show this, so that it might be determined what was the value of the

6. WILLS: undue influence: evidence.

mother's estate, if the mother got any part of the personal property or money.

There is some confusion in the record, and some of the matters assigned as error are because appellant claims that the court refused certain testimony; but, as we gather from the record, the testimony, as to some of these

7. WILLS: undue influence: evidence.

matters at least, was permitted. Without going into all these matters, we may say that we think the appellant was restricted somewhat too closely in regard to showing matters similar to those above indicated. One other circumstance, perhaps, should be referred to which has been assigned as error, and that is that the court refused to allow Mrs. Squires to testify that defendant struck his mother, and that his mother cried. This might operate against the plaintiff's contention, perhaps, in one sense, that the mother would be less likely to give a large part of the property to a son who had mistreated her, and yet, on the question of influence or fear, perhaps, the evidence was admissible, at least.

For the reasons given, we think the judgment of the district court ought to be and it is reversed and the cause remanded for a retrial or further proceedings in harmony with this opinion.

EVANS, C. J., DEEMER and WEAVER, JJ., concur.