LOUISE DURO SHAW, Appellee, v. EVELYN IRENE DURO, individually and as executrix, Appellant.

No. 46348.

MAY 2, 1944.

Gillespie & Gillespie, of Des Moines, for appellant.

Paul W. Steward, of Des Moines, for appellee.

HALE, J.—On May 16, 1941, the will of John Heber Duro was admitted to probate in the district court of Polk County, Iowa. Thereafter plaintiff, hereinafter for convenience designated as contestant, who is the daughter and only child of said John Heber Duro, brought this action to set aside such order of probate against Evelyn Irene Duro, executrix, and against Evelyn Irene Duro personally. The grounds alleged were that the will was not duly executed, lack of testamentary capacity, and undue influence. To the petition answer was duly filed by defendant, herein named as proponent, and trial was had thereon. At the end of contestant's testimony the court overruled proponent's motion for directed verdict, and at the end of all the evidence the court took from the jury the question of defective

execution and lack of testamentary capacity. The trial resulted in a verdict for contestant, the jury finding that said will was procured by the undue influence of Evelyn Irene Duro, and judgment was entered thereon. From the overruling of proponent's motion for directed verdict, from the various rulings of the trial court, and the judgment, proponent appeals.

John Heber Duro died in Florida on April 10, 1941, at the age of fifty-nine years. He was born in England and in his early days was a coal miner. He came to America in 1901 and settled in Des Moines, where he had relatives, and engaged in the coal business. He married in Des Moines and had one child, a daughter, Louise Dorothea Duro, contestant herein, who was born in 1912. The mother, Ella Gaedke Duro, died in 1919, by will leaving all of her property, including the home, to the daughter. There was testimony that this property was estimated to be of the value of $35,000 or $40,000. John Heber Duro was appointed administrator with will annexed of his wife's estate. There was no inventory or reports filed in said estate and at the time of Duro's death the estate was still not closed and no settlement or accounting had been made. The father and daughter continued to live in the home, the property of Louise, on Forty-fourth Street, in Des Moines. The estimated value of the home at one time was $11,000, but it was eventually sold by Louise after the death of her father for $7,500. This was the home of decedent until his death in 1941. The personal property of the mother was never turned over to the daughter, but remained in charge of her father during the time of her minority and thereafter. The daughter was educated in high school, Stephens College, and Drake University. For a short time after her graduation from Drake University she worked in a department store as a clerk, and later entered the office of her father, where she worked for $60 per month for seven years and until after her marriage to John Robert Shaw in 1936. She and her husband removed to Atlantic, Iowa, in 1940. Susan, their daughter, was born in 1940. The proponent, Evelyn Irene Duro, sister of decedent, was born in England in 1900. After the death of her brother's wife she came to this country in 1920 and lived with her brother and niece at the Forty-fourth Street home. These are the principal persons concerned in this suit.

The will in controversy was executed December 27, 1939, in Des Moines, and was witnessed by William Sedgwick, Clara Sedgwick, and Madeline Mary Keturokis. It gave everything to proponent, appointed her executor without bond, with full power of disposition, and made no mention of testator's daughter.

■ I. Proponent's first assignment of error is that the court erred in submitting to the jury the issue of undue influence. This is the principal question before us—whether or not there was sufficient competent evidence to authorize submission and to justify the court in its refusal to direct a verdict or take all the issues from the jury.

It is true, as argued by proponent, that more than a scintilla of evidence is necessary to make a jury question, and that mere opportunity, or a disposition to influence testator are not of themselves sufficient. Influence, to be undue, within the meaning of the law, must be such as to substitute the will of the person exerting the influence for the will of the person sought to be influenced. These rules have been many times announced by our decisions. See Arndt v. Lapel, 214 Iowa 594, 243 N. W. 605.

■ It may also be taken as established by our decisions that the burden of proof in cases of this nature is upon the contestant. But the determination whether or not there was such undue influence as would vitiate a will must depend upon the facts in each particular case. It is therefore necessary that we briefly review some of the facts developed by the testimony and presented for the consideration of the jury. It is impossible within the limits of an opinion to set out to any great extent the evidence in the lengthy trial in the district court. The abstract and amendment to abstract comprise more than four hundred sixty pages of evidence alone, not including exhibits. We shall endeavor only to summarize contestant's testimony. It is not necessary to review the testimony of proponent, which, of course, conflicts in many respects with that of contestant. The question before us is the sufficiency of contestant's evidence.

■ John H. Duro, after settling in America, became a naturalized citizen, and during the early period of his residence in Polk county engaged in coal mining, afterward acquiring interests in various mines. He had acquired some property up to

the time of the depression beginning in 1929. It appears that about that time his business failed to prosper and he had losses, with little remaining property. His early life in England had created in him habits of industry, economy, and saving. Although generous in some respects, he was inclined to place an extremely high value on money and property. About 1930, when the daughter Louise was grown, decedent contemplated another marriage. He kept company with a young woman by the name of Julia Anderson and became engaged to her in 1931. According to the testimony of Miss Anderson, now Mrs. Buth, the original date set for the marriage was 1931, but for various reasons, including financial reverses of Mr. Duro, and, as stated by him to Miss Anderson, on account of the opposition of his sister, Irene, the wedding did not take place then or at any other time, although the engagement was not immediately terminated and they continued to go together and corresponded with each other when Duro was absent from the city. Duro and Miss Anderson took occasional hunting trips to her father's farm north of Ames. On one trip on January 28, 1933, he was indisposed and suffering, as he supposed, from indigestion. He was taken with excruciating pains and was compelled to take a room at a hotel in Ames and call a doctor. Under the doctor's orders, Miss Anderson called Louise, who conveyed word to Irene. The family physician in Des Moines, Dr. Grimes, was also summoned and Miss Anderson's mother came to the hotel and remained until after Irene and Louise arrived. Irene immediately took charge and at her suggestion Miss Anderson returned to Des Moines. The evidence indicates that throughout the first period of this severe heart trouble with which Duro was afflicted during the remainder of his life, the proponent, Irene Duro, exerted her efforts in interposing obstacles to the association of her brother with Miss Anderson.

From the time of his seizure in Ames and until his death in 1941, decedent suffered from coronary occlusion and never regained his health. He was confined to his bed for a year, thereafter being compelled to avoid any exertion, overeating, and excitement of all kinds, and was required to take medicines regularly. He had a regular rest schedule and tired very easily. Too much exertion often sent him to bed for a period. He some-

times had great difficulty in breathing. While he continued to do work in his office, he was unable to spend full time there and had to be careful about his expenditure of energy in either physical or mental work. There were other complications and it appears from the testimony that the ailment from which he suffered would have been earlier fatal had it not been for his extreme care and caution. It is impracticable and would be useless to set out with any degree of fullness the testimony which was presented to the jury regarding his seriously weakened condition. It is sufficient to say that up to the time of his death his principal care was to maintain life by the avoidance of anything which might interfere with his dangerous cardiac condition. Throughout this period his sister Irene acted as his nurse and supervised his actions, his diet, and his care in general. While he attended various meetings of the companies in which he was interested, there were times when he was compelled to leave before the meetings were over and he would take very little or no part in the conversation or discussion. There was testimony, as shown by the statement of Evelyn Irene Duro in an affidavit to the Travelers Insurance Company of Hartford, that the period during which the insured was disabled from performing any and every kind of duty pertaining to his occupation was from January 29, 1933, at 10 a. m. to April 10, 1941, at 12 p. m. It appears from the testimony that the care administered by Irene was voluntary, and there were times when the subject of employment of a nurse was brought up, but Mr. Duro stated that he could not make changes because he was afraid of his life and he would not risk his life by doing things which gave him these spells which almost made him pass out. At one time he stated if Irene left him he would be helpless. She was in full charge of the home and there was testimony that social visits from friends became gradually fewer and not many people came to the house.

While the question of testamentary capacity was withdrawn by the court and is not before us, it is well to consider the physical and mental strength of the testator in view of the claimed influence exerted upon him by proponent. This court has frequently held that in cases of this kind we may take into account the physical condition and strength of mind of a person

784

whose will is under consideration. See In re Will of Wiltsey, 135 Iowa 430, 109 N. W. 776; In re Estate of Eiker, 233 Iowa 315, 6 N. W. 2d 318; and Stephenson v. Stephenson, 62 Iowa 163, 17 N. W. 456.

Throughout this long period of decedent's illness, Irene not only had charge of the house and supervised him personally as to diet, etc. but took an active part in his business affairs as a director of one of his companies and an officer of another. She swore to tax-assessment rolls and paid the premiums on insurance policies. She had free access to his safe-deposit box, which was held jointly by Duro and herself. For a time the daughter, Louise, had access to this box, but this authorization to Louise was later revoked by Irene herself. She transferred decedent's securities and occupied a position of trust in the handling of his business affairs generally. This close business relationship between Duro and his sister not only extended throughout the period of his illness but had existed before his heart attack at Ames. Duro appears to have been a man who took a great interest in his relatives. Irene was only twenty years of age when brought to this country by her brother. She took her place in his household as general housekeeper and supervisor at a time when the daughter, Louise, was a child. While the record indicates that Irene had possessed no means of her own, yet, as time went on she acquired by gift from her brother what amounted to a good-sized estate. There was testimony that through these gifts or transfers of property there was in her hands at the time of his death a large amount of stocks, bonds, and securities having an actual value of over $30,000. In addition, she received various gifts of real estate from him, and at the opening of the joint safe-deposit box after Duro's death the stocks and bonds noted above were found, together with a large amount of jewelry. The total value of all property held or claimed by Irene was over $90,000, as estimated and claimed by contestant. Whatever the actual value, the total amount owned by her, and which must have been acquired by gift or transfer from her brother, was a large sum. Whether or not the original gifts to her had increased by her own saving, it is undoubtedly true that her business relationship with her brother

was of great financial benefit to her. In one of the companies in which he was interested she held the controlling interest. In addition to this real and personal property held by Irene there were several insurance policies on her brother's life, procured by him, which were payable to her. To set out or attempt to set out in detail the various business transactions whereby she derived this property would be impracticable and of little benefit. It is sufficient to say that there was ample evidence from which the jury could determine that she was well provided for by her brother's gifts during the period of her stay with him; and for Duro to have severed their business relations after she had acquired much of this property would have been dangerous to him from a business standpoint. Under such a state of facts, the jury could well infer that he was to a great extent under the domination of his sister. The jury was warranted in considering the amount of her property derived from Duro during his lifetime much in excess of any reasonable wage or salary for services rendered, and especially so as the value of the estate which Duro himself left was in the neighborhood of $75,000. The property owned and held by the daughter, Louise, at the time of the execution of the will, including the home but not the personal property to which she was entitled from her mother's estate, was in the neighborhood of $20,000.

The inequitable and unjust provisions of the will, the financial condition of the testator and of Irene and of Louise, the unreasonableness and unnaturalness of the will, were all in evidence. These matters, standing alone, would not justify the jury in finding undue influence, yet they are properly taken into consideration. Cash v. Dennis, 159 Iowa 18, 139 N. W. 920.

There is no doubt that Duro had a strong affection for his daughter. Having had little schooling during his early years, he gave her the opportunity to acquire an excellent education. Notwithstanding that decedent made no accounting for Louise's property inherited from her mother and that he continued to reside in the home belonging to her without payment of rent, he did, however, transfer to her certain personal property and at one time a farm of rather low value. Apparently the relations between father and daughter were agreeable and he never lost his affection for her. When at times he manifested some impatience

786

at her late hours, he was only naturally solicitous of her welfare and conduct. But it does not appear in the record that there was much occasion for him to worry about her actions. She kept company with a young man whom she later married and who had attended school with her. They were engaged to be married and there is evidence that this relationship was not satisfactory to Irene and that she frequently manifested her disapproval. These objections of Irene's were so strong that at times Louise's fiancé was not permitted to come to the family home, and there was evidence that Irene told her brother she did not like Bob, she thought he drank too much, that he was lazy and did not have any ambition or he would not be working in a service station. These statements are not sustained by the record. There was evidence that the young man, though not possessed of much means, was of good character and had advanced in position in his employment. While neither Louise nor her fiancé possessed the thrifty habits of her father and aunt, yet there is little occasion to think they were spendthrifts or unworthy. It is argued that the sale of the farm which Duro had given to Louise, and which she sold after his death for a price less than cost, is an indication that Irene's antipathy to Louise's husband was well-founded, but there was evidence indicating that the sale to Louise's uncle was encouraged and financed by Irene herself. This opposition of Irene's to Louise's association with her future husband did not cause complete estrangement between father and daughter, but the jury could well find that it would tend to inspire in Duro lack of confidence in Louise and her husband. The testimony warranted the jury in finding that there was influence brought to bear by Irene against Louise, the natural object of her father's bounty.

As to the will itself and the circumstances surrounding its execution, it appears from the evidence that there had been a previous will executed by Mr. Duro, which, from a signed statement on an envelope found in his safe-deposit box, had been withdrawn and canceled. The will in question herein was executed on December 27, 1939. Frank G. Ryan, who was attorney in receivership proceedings involving Sam and Will Duro, brothers of John, and in which matter John H. Duro was receiver, was requested by Mr. Duro to come to his home on De-

cember 27, 1939, to go over some matters in connection with the receivership, as Duro and his sister were leaving to drive to Florida at 10 a. m. on that day. Mr. Ryan appeared at the house about 8:45 a. m. and was met at the door by Irene, who requested him to wait in the living room. While so waiting, Mr. Ryan observed two other persons enter the front door and go upstairs. These were two of the witnesses to the will, Mr. and Mrs. Sedgwick, neighbors, summoned by Irene. Another witness, Madeline Mary Keturokis, who had been employed in the office of the coal company in which Duro was interested, was in the home that morning assisting Irene in preparations for the journey. When the will was signed Mr. Duro was lying in bed and the only people in the room were Duro, Irene, and the three witnesses. Mr. Duro signed the will twice, "John Heber Duro" and "J. H. Duro." The former was not his usual signature. At the same time Evelyn Irene Duro executed her will with the same witnesses. Her will was introduced in evidence. It left all of her property to John H. Duro, but if he predeceased her, then, in addition to household goods and personal belongings, left half of Irene's property to Louise and the balance to other nieces and nephews. After Duro's will was signed it was taken into her possession by Irene and deposited by her in the safe-deposit box. The record does not disclose who prepared the two wills. Madeline Mary Keturokis, although familiar with the use of a typewriter and no doubt competent, at no place intimates that she prepared them. Irene owned a typewriter and was familiar with its use. From her activity in arranging for the execution of the wills, the jury would be justified in inferring that they were either prepared by herself or under her direction. She had possession of the instruments before and after the same were signed and continued to hold them until the death of her brother. To be considered is the fact that she remained in the room and was present at the execution of the will, together with the fact that the will was entirely in her favor. See Liddle v. Salter, 180 Iowa 840, 163 N. W. 447; Squires v. Cook, 175 Iowa 586, 157 N. W. 253; Haman v. Preston, 186 Iowa 1292, 173 N. W. 894, citing Graham v. Courtright, 180 Iowa 394, 161 N. W. 774, Liddle v. Salter, supra, and Hull v. Mitchell, 181 Iowa 51, 162 N. W. 235.

The record does not indicate that Louise was at any time prior to her father's death consulted or informed, either by Irene or Duro, as to the disposition to be made of her father's estate. That the will in question differed from testator's former will must be presumed; otherwise there would have been no occasion for a new will. The terms of his will were known only to testator and his sister. No attorney was consulted and there was no independent advice of any kind, so far as the record discloses. This lack of independent advice is in itself a circumstance to be considered by the jury. What knowledge Louise derived came from Madeline Mary Keturokis but was not as to the exact terms of the will. The information she derived from Irene was after her father's death. Louise made the statement on cross-examination that her father had told her something about it, but on redirect examination she was not permitted to state what had been said at the time. We are satisfied that the circumstances attending the execution of the will were proper to be considered by the jury and sufficient to arouse suspicion and require submission to the jury in connection with the other testimony introduced. Haman v. Preston, supra; Brogan v. Lynch, 204 Iowa 260, 214 N. W. 514; and Squires v. Cook, supra.

We have not attempted to set out all the testimony or all the circumstances connected with the relationship of the parties, or the facts in regard to the numerous property interests and transfers of property between them. There was other testimony regarding Irene's threats of suicide, her complaints and disparaging remarks to Duro regarding Louise and her husband, her treatment and jealousy of Miss Anderson, her interference with her brother's social life, the statements made to Duro in the nature of threats to his business, and other evidence tending to a greater or less degree to indicate her endeavors to manage and control her brother's life. There was sufficient independent evidence of undue influence to authorize the admission and consideration of the various declarations made by testator as to his sister's supervision of his life. In re Estate of Rogers, 229 Iowa 781, 295 N. W. 103. The jury could properly find that decedent was weakened in health, lacking in the mental and physical vigor which had once characterized him and his actions, increasingly under the dominant influence of his sister, whom

he had befriended in many ways and who had become so necessary to his existence that any threatened separation from her caused great apprehension in his mind, and that she had acquired control of a substantial part of his estate. They could consider the fact that the testator was under obligation to Louise, not only those natural obligations of parent to child, but he was financially indebted to her throughout the latter part of his life and by the use of his daughter's inheritance had acquired a greater part of his fortune. She was the natural object of his bounty. The evidence was circumstantial and could not well have been otherwise. Circumstantial evidence in cases of this kind is sufficient, as has been many times established by our decisions. The evidence referred to above was all presented to the jury, and we are satisfied that all the circumstances detailed in the evidence, taken together, would authorize submission to the jury and a verdict thereon finding undue influence.

General rules relating to the question of the submission of undue influence are set out in some of our recent cases. See In re Estate of Eiker, supra; In re Estate of Brooks, 229 Iowa 485, 294 N. W. 735; In re Estate of Heller, 233 Iowa 1356, 11 N. W. 2d 586, and cases cited therein. It is unnecessary to review the large number of cases cited by contestant and proponent. Without extended reference thereto, we call attention to a number of cases cited by proponent in argument: White v. White, 213 Iowa 1244, 241 N. W. 1; In re Will of Muhr, 218 Iowa 867, 256 N. W. 305; Campbell v. Hale, 233 Iowa 264, 6 N. W. 2d 128; Furlong v. Carraher, 108 Iowa 492, 79 N. W. 277; In re Will of Richardson, 199 Iowa 1320, 202 N. W. 114; In re Will of Eveleth, 177 Iowa 716, 157 N. W. 257; Zinkula v. Zinkula, 171 Iowa 287, 154 N. W. 158. We have not undertaken to set out all the authorities listed by proponent but we have carefully examined all of the cases to which we have been referred. The main question in any case of this kind is one of fact. In all the above cases the facts differ materially from the case at bar. We are satisfied that under the facts in this case there was a jury question.

II. Other assignments of error are made. Proponent alleges error in exclusion of her testimony as to transactions with decedent. The testimony was proffered and it was claimed the

cross-examination by contestant had opened up the question of communications and personal transactions between Irene and John Heber Duro and arose out of the cross-examination in regard to certain insurance policies and the will. Irene had testified that she could not change the beneficiary in her will or in any of the insurance policies, either legally or otherwise, and in response to the question as to whether she had a binding legal agreement not to revoke the will or change the beneficiary, she stated, "I made a promise." Upon this somewhat slim foundation she was interrogated by her counsel as to transactions with decedent. The court refused to permit this redirect examination and in this the court was not in error. Nothing was said or asked about a promise or to whom it was made and the testator's name was not mentioned in any way. The answer was voluntary and we think in no way authorized the proposed testimony.

III. Witnesses were asked whether decedent appeared to be happy, and whether he seemed chagrined, humiliated, or embarrassed. They were permitted to testify and proponent contends this was error. We see no error. A conclusion of the nature inquired about is competent when the matter to which the testimony relates cannot be reproduced or described to the jury precisely as appeared to the witness at the time. This court has many times approved the introduction of testimony of that nature: for example, that horses were frightened; or a person was angry or excited or conscious or was trying to get away; a condition of health; that persons acted childish, that they were agitated, crying or cross, looked angry, and many other instances of that character. Some of the cases cited by contestant, and which support her contention, are: Yahn v. City of Ottumwa, 60 Iowa 429, 15 N. W. 257; Mikesell v. Wabash R. R. Co., 134 Iowa 736, 112 N. W. 201; Schmidt v. Dubuque County, 136 Iowa 401, 113 N. W. 820; Rosenbaum Bros. v. Levitt, 109 Iowa 292, 80 N. W. 393; Scrimgeour v. Chase, 145 Iowa 368, 124 N. W. 193; State v. Graham, 203 Iowa 532, 211 N. W. 244; Bever v. Spangler and Blake, 93 Iowa 576, 61 N. W. 1072; Vannest v. Murphy, 135 Iowa 123, 112 N. W. 236; McDonald v. Franchere Brothers, 102 Iowa 496, 71 N. W. 427; State v. Crafton, 89 Iowa 109, 56 N. W. 257; State v. McKnight, 119

Iowa 79, 93 N. W. 63; State v. Hickman, 195 Iowa 765, 193 N. W. 21; Weber v. Chicago, R. I. & P. R. Co., 175 Iowa 358, 151 N. W. 852, L. R. A. 1918A, 626; Grismore v. Consolidated Products Co., 232 Iowa 328, 5 N. W. 2d 646. Proponent cites no authority in support of her claim that the evidence was erroneously admitted.

IV. One other assignment of error is made by proponent. At one time there had been an embezzlement in decedent's office. Decedent's daughter, Louise, was an employee in said office at the time and while it was not directly claimed that she was in any way concerned with the theft, apparently, to remove any impression of suspicion, contestant in rebuttal interrogated Harry Chittenden, superintendent of the claims department of the United States Fidelity & Guaranty Company, who had investigated the defalcation, which was admitted under oath by one Cowan. In response to a question the witness stated he did not find any evidence or indication that Louise Duro Shaw was connected with the theft in any way. This admission is assigned as error. We see no error here. The witness was not asked to testify as to any fact or in any way to invade the province of the jury. He simply stated that he had discovered no evidence. We are satisfied that it was proper to permit him to state this result of his investigation. Even if incompetent, and if there was error in the admission of such testimony, the facts of the embezzlement were so fully shown and are so conclusive that the question and answer were without prejudice. There was no direct testimony that the father even suspected his daughter was in any way connected with the loss of the money.

No objection was made to the instructions nor was there any motion for new trial. The main question, as we have stated, is whether the jury was authorized under the evidence to render the verdict finding undue influence. We have held that the evidence was such that they were so authorized.

Appellee filed motion in this court to strike appellant's brief and argument and amendment to brief and argument for failure to comply with former Rule 30. We have examined the motion and resistance thereto and are satisfied that the point at issue was sufficiently presented. We have considered the case on its merits. Appellee's motion is overruled.

Finding no error, we are satisfied that the verdict of the jury and the judgment rendered thereon should be, and are, affirmed.—Affirmed.

All JUSTICES concur.